John **HERRINGTON**, et al., Plaintiffs,

v.

**COUNTY OF SONOMA**, Defendant.

No. **C–80–2227–CAL.**

United States District Court,
N.D. California.

Nov. 4, 1991.

Amended Dec. 30, 1991.

---

AMENDED OPINION AND ORDER
FOR JUDGMENT

LEGGE, District Judge.

Plaintiffs John and David Herrington brought this action against the County of Sonoma, initially alleging violations of procedural due process, substantive due process, and equal protection under the Fourteenth Amendment, and a taking of property under the Fifth Amendment. The dispute arises from the County's determination that the Herrington's 32–lot subdivision proposal for their property was inconsistent with the County's 1978 General Plan.

During the first trial, plaintiffs abandoned their claim of a taking of property. The jury found liability in favor of plaintiffs and against the County, and awarded $2,500,600 damages to plaintiffs on their Fourteenth Amendment claims under 42 U.S.C. § 1983. The court then entered a stipulated order finding the County's inconsistency determination to be invalid. The validity of the General Plan and the West Sebastopol Specific Plan were not affected by the judgment.

The Ninth Circuit affirmed the finding of liability and the order invalidating the County's inconsistency determination, but it vacated the award of damages. *Herrington v. Sonoma County*, 834 F.2d 1488, 1503 (9th Cir.1987), *amended by*, 857 F.2d 567 (9th Cir.1988). The case was remanded for a new trial on the issue of damages.

On remand, the parties waived a jury and a court trial was held. The court has heard and reviewed the evidence.[1] The court has also considered the record, the arguments of counsel, and the applicable authorities. This opinion constitutes the court's finding of facts and conclusions of law as provided in Rule 52(a) of the Federal Rules of Civil Procedure. The facts are found by a measure of a preponderance of the evidence.

I.

The background facts are set forth in the Ninth Circuit's opinion and need not be

Paul O. Lamphere, Martinez, Cal., Frederik A. Jacobsen, P.C., San Mateo, Cal., for plaintiffs.

Antonio Rossmann, San Francisco, Cal., Michael D. Senneff, Senneff, Bernheim, Emery & Kelly, James P. Botz, County Counsel, Stephen K. Butler, Asst. County Counsel, Santa Rosa, Cal., for defendant.

---

1. Certain offered exhibits were not ruled upon by the time that the case was submitted for decision. The court has reviewed those exhibits and rules that exhibits AX, AY, BC, BQ, BT and BU are admitted evidence but exhibit BH is not.

repeated here. 834 F.2d at 1491–94. However, because several aspects of the Ninth Circuit's opinion directly affect this damages trial, a discussion of those elements is necessary. This court determined, during extensive pretrial hearings after remand, that certain findings from the first trial had been affirmed by the Ninth Circuit and had become the law of the case. In addition, when the parties could not agree on the measure of damages to be used on retrial, this court defined a measure of damages which it believed to be consistent with the Circuit court's decision. *Id.* at 1503–06.

### A.

At the first trial, the Herringtons claimed $810,000 for "lost value" to their property. That figure represented the difference between an estimated value of $1.3 million, assuming the potential to construct 32 lots on the property, and an estimated value of $490,000 assuming no development at all. Those values were derived from the testimony of plaintiffs' expert and of plaintiff David Herrington.

The Ninth Circuit discussed those valuations in its opinion. It held that the $1.3 million figure was too high because approval of a 32–lot subdivision by the County was speculative. 834 F.2d at 1504. The Court also decided that the $490,000 figure was too low, because it was based on a theory of the total deprivation of economic use of the land—a total taking. *Id.* at 1505. "However, the Herringtons abandoned their taking claim, and cannot now argue that they were left with no economically viable use of their land." *Id.* Thus, the Ninth Circuit held that the $810,000 lost value figure was overstated. As will be discussed below, one of the Circuit's decisions which is central to this retrial is that the harm to plaintiffs from the County's conduct was a *temporary* taking of their ability to use or develop the property. Id. at 1505, 1506.

### B.

At the retrial, plaintiffs sought to introduce testimony that the value of the property with a 32–lot subdivision potential was substantially *more* than $1.3 million, and that the value of the property with no development at all was *less* than $490,000. Plaintiffs seek to argue that the lost value exceeds $810,000.

However, the principle of the law of the case precludes a court from reexamining an issue previously decided by the same court, or a higher appellate court in the same case. *Moore v. Jas. H. Matthews & Co.*, 682 F.2d 830, 833 (9th Cir.1982). This principle is an analogous but less absolute bar to relitigation than *res judicata.* The law of the case is an equitable doctrine, *United States v. Maybusher*, 735 F.2d 366, 370 (9th Cir.1984), *cert. denied*, 469 U.S. 1110, 105 S.Ct. 790, 83 L.Ed.2d 783 (1985), that should not be applied "woodenly" when doing so would be inconsistent with "considerations of substantial justice." *United States v. Imperial Irrigation District*, 559 F.2d 509, 520 (9th Cir.1977) *rev'd in part, vacated in part on other grounds*, 447 U.S. 352, 100 S.Ct. 2232, 65 L.Ed.2d 184 (1979). "While the 'law of the case' doctrine is not an inexorable command, a decision of a legal issue or issues by an appellate court establishes the 'law of the case' and must be followed in all subsequent proceedings in the same case in the trial court ..." *White v. Murtha*, 377 F.2d 428, 431–32 (5th Cir.1967) (cited in *Moore*, 682 F.2d at 834).

In addition, factual issues cannot be retried under the so-called mandate rule, which is broader than the rule of the law of the case. A district court is free to decide anything not foreclosed by the mandate. *United States v. State of Louisiana*, 669 F.2d 314 (5th Cir.1982). However, a district court may not exceed the directions of the mandate by retrying facts or altering findings. *Id.* General principles of estoppel also prevent the Herringtons from claiming values that depart from the Ninth Circuit's analysis.

Whether the principles of the law of the case, the mandate rule, or estoppel control this mixed question of law and fact, this court determined before the retrial that $810,000 represented the maximum lost

value of the property which plaintiffs could claim resulted from the acts of the County. The Herringtons were nevertheless permitted to present evidence at the retrial that their lost value exceeded $810,000. The court allowed this evidence to be placed in the record, for the reason that if the Court of Appeals later decides that this court's damages limitation or measure of damages is incorrect, there will be a complete record for a final award to plaintiffs without the necessity for yet another retrial.

## C.

At the first trial, plaintiffs sought three components of damages: loss of value, loss of profits, and loss of return on those two elements. The jury awarded all elements of damages, for a total exceeding $2.5 million. In reversing that award, the Ninth Circuit noted that the damages "components are excessive or cumulative in at least three respects:

1) the valuation of each component is speculatively based on the assumption that the County could not legally have foreclosed development of approximately 32 units and on the assumption that the only alternative to the Herringtons' 32-lot proposal was no development at all; 2) because the Herringtons retained ownership of their land and because they have obtained invalidation of the inconsistency determination, the damage suffered is largely temporary rather than permanent; and 3) the awards for lost value and lost profits are duplicative.

*Id.* at 1504. Although the Court proceeded to evaluate the potential measure of damages under these three components, it specifically declined to express an opinion "as to whether *any* of the three components of damage asserted by the Herringtons are appropriate in this case," holding only "that, for the reasons stated above, these components are excessive and cumulative." *Id.* at 1506.

The Ninth Circuit anticipated that on remand there would be difficulties in calculating defendant's damages caused by the due process violation. It said that "the trial court may well be at sea in its attempt

to fix damages." 834 F.2d at 1506 n. 23. The Court held that the Herringtons' "loss was temporary, not permanent," *id.* at 1505, and that "we know neither the proper length of the delay nor the 'highest and best permissible use.'" *Id.* at 1506 n. 23. The Court also indicated that the "harm caused by the County's unconstitutional acts derives primarily from *delay* in the proper consideration of the Herringtons' subdivision application." (emphasis added.) *Id.* at 1506. The dissenting opinion noted that "the County's rejection of their development plan may have been a final decision about the proposed subdivision, but it was not a final, definitive statement of how the County would apply the general plan to the Herringtons' land." *Id.* at 1507. This court concludes from the holdings and statements of the Ninth Circuit that the Court has ruled that plaintiffs can recover only damages based on the *temporary* loss of use of their property.

The opinion suggested that a surrogate measure of damages could be employed by this court as a possible solution to the damages difficulties. *Id.* at 1506 n. 23. The Circuit suggested that as a surrogate measure of damages, this court might look to "the difference between the value of the property immediately before the County's inconsistency determination and its value immediately after that determination." *Id.*

On remand, this court held several pretrial hearings to decide the appropriate measure of damages on which evidence would be received. In accord with the Ninth Circuit opinion, this court viewed the Herringtons' loss as temporary rather than permanent in nature. Thus, the damages had to be analogous to a "temporary taking" of property.

At the time this action was filed, only injunctive relief was available as a remedy for a temporary taking in California. *See Agins v. City of Tiburon*, 24 Cal.3d 266, 277, 157 Cal.Rptr. 372, 598 P.2d 25 (1979) ("mandamus or declaratory relief . . . is the appropriate relief under the circumstances.") *aff'd* 447 U.S. 255, 100 S.Ct. 2138, 65 L.Ed.2d 106 (1980); *HFH, Ltd. v. Superior Court of Los Angeles County*,

15 Cal.3d 508, 519, 125 Cal.Rptr. 365, 542 P.2d 237 (1975), *cert. denied*, 425 U.S. 904, 96 S.Ct. 1495, 47 L.Ed.2d 754 (1976) ("judicial remedy in the undoing of the wrongful legislation, not in money damages against the state."). In *First English Evangelical Lutheran Church of Glendale v. County of Los Angeles*, 482 U.S. 304, 107 S.Ct. 2378, 96 L.Ed.2d 250 (1987), the U.S. Supreme Court ended the longstanding practice in California and other states of limiting relief for temporary takings to invalidation of the unconstitutional governmental acts.[2]

Cases defining the damages for a temporary taking have generally applied some variation of the "before and after" valuation method. *See Nemmers v. City of Dubuque*, 764 F.2d 502, 505 (8th Cir.1985); *Wheeler v. City of Pleasant Grove*, 833 F.2d 267, 271 (11th Cir.1987) (trial court should award "market rate computed over the period of the temporary taking on the difference between the property's fair market value without the regulatory restriction and its fair market value with the restriction."). This method of determining lost value requires this court to determine what valid restrictions could be placed on plaintiffs' land, in order to set an "after" value. The Ninth Circuit noted that "the Herrington's never had a 'right' to construct a 32-unit subdivision," 834 F.2d at 1504, and that "[a] consistency determination is a preliminary determination which merely gives the developer the 'green light' to proceed with its development application." *Id.* "The County is not, and never has been, precluded from rejecting the Herringtons' 32-lot proposal, as long as that rejection is not irrational and arbitrary." *Id.* at 1505. The Ninth Circuit also noted that "[t]he Herringtons' apparent contention that the 32-lot proposal would eventually have been approved had it been found consistent with the General Plan is entirely speculative." 834 F.2d at 1504.

Thus, in order to determine an "after" value for the Herringtons' property, this court would have to determine what level of development, if any, the County would have permitted. Based on the evidence, this determination could range from approximately seven to thirty-two units. The problem, to restate it for emphasis, is that any estimate of the "after" value of the property is dependent upon the level of development permitted by the County within the lawful exercise of its discretion.

### D.

Plaintiffs have argued for a theory of damages predicated on the assumption that the "highest and best use" of the property was a subdivision, and that such use was "taken" by the County for a period of nine years and three months. This argument takes into account the down zoning of the Herringtons' property on March 4, 1980, when the West Sebastopol Specific Plan was adopted and limited development of the property to seven units. Plaintiffs argue that their "highest and best use" was not returned until enactment of the 1989 General Plan, which increased the number of permissible units to a total of ten, because it was not economically feasible to develop the property at any lower level of density. This court rejected that measure of damages because it is predicated on a theory that plaintiffs were denied the economic value of developing their land. As stated by the Ninth Circuit, "the Herringtons abandoned their taking claim, and cannot now argue that the County denied them all economically viable use of their land." 834 F.2d at 1505.

The County argued that the "before" and "after" values are the same; that is, that plaintiffs are entitled to no damages. The contention is that the inconsistency determination was merely a preliminary decision by the County, and that the grant or denial of consistency would have no effect on the price a willing buyer would pay for the property. This court disagrees with that argument. Before any decision is made on consistency, a willing buyer would evaluate the risks of a favorable or unfa-

---

**2.** At the first trial, plaintiffs succeeded on their Fourteenth Amendment due process and equal protection claims, and therefore were not pre-vented from recovering damages by California law applicable to takings claims under the Fifth Amendment.

vorable decision and would adjust his offer accordingly. The court finds that the property would have more value to a developer-buyer with a consistency decision than if there were a decision of inconsistency or no decision at all.

### E.

In an attempt to define a measure of damages that avoids the speculativeness of determining how many units plaintiffs would have been permitted to develop, and the extremely divergent positions of the parties, this court proposed its own measure of damages, based primarily on a probability analysis. This measure of damages was presented to the parties, who had an opportunity to comment upon it during the series of pretrial hearings. The court's damages formula reduces the speculative aspects of the inquiry, by focusing on the relevant issues involved in the Herringtons' subdivision application and assessing the probability of approval based on criteria normally considered by the County in processing subdivision proposals. The probability analysis also eliminates the necessity for a separate determination of plaintiffs' duty to mitigate their damages, since probability subsumes that issue.

The formula defined below assigns a percentage of probability to the $1.3 million and the $490,000 "boundary" values. $1.3 million represents the value of the property with the potential to develop a subdivision of approximately 32 lots. $490,000 represents the value of the property with no development rights at all. The Herringtons could recover the maximum $810,000 differential in the "boundary" values only if their evidence at trial proved that there was a 100% probability that their subdivision proposal would have been approved but for the County's illegal acts.

The formula reduces speculation on what subdivision proposals might have been submitted, and on possible levels of development short of 32 lots that the County might have approved. The formula also factors in the reasonableness of the Herringtons' subdivision proposal and the County's procedures in handling subdivision applications after a consistency determination. During the retrial, the parties presented evidence on the likelihood of approval of the 32-lot proposal, by examining the completeness of the application, environmental impacts, water availability, soil percolation, drainage, street grades, views, impact on agriculture, and other relevant aspects of land use.

The formula then computes a reasonable rate of return to be applied to the lost use-value of the property. This component was identified by the Circuit: "Because the Herringtons retain their property, they have, at best, suffered *delay* in receiving the $810,000. That delay is fully compensated by awarding interest (*i.e.*, loss of return) for delay in receipt of the lost value." *Id.* at 1505.

The formula also addresses the length of time the Herringtons were delayed in the processing of their subdivision. This court determined that the beginning date of the delay period was the date of the inconsistency determination by the Board of Supervisors, December 11, 1979. The determination on that date was the final step of the process for a consistency determination, and a "green or red light" on whether to proceed with the development application. Normal administrative delays are not compensable in temporary takings. *First English Evangelical Lutheran Church v. County of Los Angeles*, 482 U.S. at 321, 107 S.Ct. at 2389. Therefore, no recovery for any delay prior to the Board of Supervisor's decision on December 11, 1979 is appropriate.

This court also recognized, consistent with the Ninth Circuit's opinion, that plaintiffs might recover other delay costs, such as the increased costs of street and utility improvements, if justified by the evidence. Because no specific level of development is defined by the court's formula, the same percentage probability factor must be applied to any increased costs of development.

The formula defined by the court, and addressed by the parties and witnesses during the retrial, is the following:

$$[(aX + bY) - Y] Rt + ac$$

In which:

a = probability of approval of 32 lots.

b = probability that 32 lots would not be approved.

(a + = 100%).

X = value of the land with a 32-lot subdivision potential (not more than $1.3 million).

Y = value of the land with no development (not less than $490,000).

(aX + bY) = weighted probability of approval of 32 lots.

R = rate of interest.

t = duration of the delay, after December 11, 1979.

c = increased costs of development resulting from the delay.

## II.

The parties presented extensive evidence on the elements of the formula. In addition, briefs were filed addressing relevant legal issues.

### A.

Plaintiffs presented evidence that the value of X exceeded $1.3 million and that the value of Y was less than $490,000. (As stated, this court did not consider that evidence, because it exceeds the "boundary" limits which this court believes were defined by the Ninth Circuit. The evidence was admitted solely in the event that the Court of Appeals later decides that those limits are not binding, and the appellate court can then fix damages without a further retrial.) The County presented no direct evidence on the development values, except to contend that the difference between them was zero—an argument discussed above. This court concludes that the value of X must be $1.3 million and the value of Y must be $490,000.

### B.

Most of the evidence addressed factors (a) and (b), the percentage of probability of approval of the 32-lot subdivision. The evidence pertained primarily to: (1) whether the Herringtons' proposal was consistent with the 1978 General Plan; (2) whether an environmental impact report ("EIR") would have been required; (3) whether water of sufficient quality and quantity was available to supply the proposed subdivision; (4) whether sufficient sewage percolation existed for the proposed lots; (5) whether a completed subdivision application was actually on file with the County; (6) the work that was done on the project before the proposal was filed in May 1979; and (7) other subdivisions in the County. This court need not make a separate finding of fact on each of those subjects, since the overall issue is one of the probability of approval of plaintiffs' proposal, but will comment on certain evidence and arguments.

### Consistency Determination

At the first trial, the jury invalidated the determination of the County's Board of Supervisors that the Herringtons' subdivision proposal was inconsistent with the County General Plan. The Board had found the Herringtons' proposal inconsistent with the (1) density, (2) conflict with resources, and (3) project design elements of the General Plan. The Ninth Circuit affirmed the jury's invalidation of those decisions.

At the retrial, plaintiffs moved to exclude any evidence that their plan was inconsistent with those three elements of the General Plan, arguing that consistency had been decided by the first trial and appeal. In the first appeal, the Ninth Circuit found sufficient evidence to support the jury's decision that the Board's inconsistency determination was irrational, arbitrary, capricious and unsupported by the evidence. The fact that the County's inconsistency decision was overturned, however, did not establish the converse—that the subdivision proposal was *consistent* with the General Plan. The first trial and appeal merely resolved that the Board's decision was procedurally invalid. Even in determining that a decision was procedurally invalid, a court still cannot usurp the power vested in local legislatures to make lawful land use decisions. The County had the power to deny the Herringtons' subdivision

proposal on any number of permissible grounds. 834 F.2d at 1505 & n. 19. The question now is whether the same grounds (inconsistency with the General Plan) used to reject the original application can still be considered by this court in determining the probability of ultimate approval. The central question is how likely it is that the Herringtons' proposal would have been approved had the County not acted in violation of plaintiffs' constitutional rights.

The County may not argue that the original decision of its Board of Supervisors was proper. However, the County is not precluded from contending that had the Board acted properly, it still would have denied the proposal. It is relevant to the damages inquiry whether the Board would have denied the proposal, since "[t]he County is not, and never has been, precluded from rejecting the Herringtons' 32–lot proposal, as long as that rejection is not irrational or arbitrary." *Id.* at 1505. This court may therefore examine the evidence to determine the percentage of probability that the County might have properly denied the Herringtons' proposal as inconsistent with the General Plan. Although this requires the court to consider certain evidence presented at the first trial, that evidence again bears directly on the issue of damages.

The evidence demonstrated several reasons why the County might have properly rejected plaintiffs' proposal as being inconsistent with the General Plan. The property is in the Coastal Planning Area. The General Plan does not contemplate any new subdivisions in this area ("no new major subdivisions expected"). Plaintiffs' proposal creates possible conflicts between residential areas and surrounding agricultural use; the General Plan seeks to maintain agriculture in this general area. Voluminous evidence was presented on subsequent subdivision developments (*e.g.*, LaFranchi, George, Marra, Fedrick Ranches) in the County. And the County approved the consistency of the Harmony School District with the General Plan and the West Sebastopol Specific Plan. While relevant to plaintiffs' claims, those other developments do not control the issues here. Their rele-

vance to plaintiffs' property varies according to their location, type of development, zoning areas, and timing.

*Environmental Impact Report*

Both the Herringtons and the County presented substantial evidence on whether an EIR would have been required before the Herringtons' tentative map application would have been approved by the County. Preparation of an EIR normally requires nine to twelve months. If an EIR would have been required, it is unlikely that plaintiffs could have received approval from the County prior to the effective date of the West Sebastopol Specific Plan. Because that Specific Plan restricted development to seven units, the Herringtons' 32–lot proposal would not have been approved unless it was "grandfathered" under the more liberal density provisions of the earlier General Plan.

Plaintiffs argue that an EIR would not have been required because all environmental impacts had been addressed before the filing of the application. During a period of approximately three years prior to their application, the Herringtons hired planning and engineering consultants and commissioned resource reports. In consultation with the County planning staff, plaintiffs developed project designs for the purpose of meeting the concerns of the County on several issues. Those efforts were made in the pre-application period in the hopes of avoiding the necessity for an EIR.

Whether an EIR is to be required is governed by the California Environmental Quality Act of 1970 (CEQA) and the applicable guidelines. Cal.Pub.Resources Code § 21000 et seq. (West 1991). The CEQA regulations that were in effect in 1979 stated that:

(a) If the Lead Agency finds after an initial study that the project may have a significant effect on the environment, the Lead Agency must prepare or cause to be prepared an [EIR].

(b) An EIR should be prepared whenever it can be fairly argued on the basis of substantial evidence that the project may

have a significant effect on the environment.

(c) An EIR should be prepared when there is serious public controversy concerning the environmental effects of a project. Controversy not related to an environmental issue does not require the preparation of an EIR.

Cal.Admin.Code, tit. 14, § 15084.

The Herringtons' proposal did anticipate many of the environmental concerns associated with the development of a major residential subdivision. And it included several features mitigating some of the environmental effects. These procedures increased the possibility that the Herringtons would not be required to alter their proposed subdivision after filing in order to mitigate the environmental impacts.

However, the existence of the environmental issues also demonstrates the environmentally sensitive nature of the area, and the need of the County to consider carefully the environmental impacts resulting from a project of that magnitude. The court finds and concludes that sufficient environmental issues still existed which would have required the preparation of an EIR. There were other environmental impacts associated with the proposal that were not fully addressed in the pre-application period: traffic congestion, impact on agriculture, pressure for additional growth in the area, drainage and easements, street grades, and potential impact on Salmon Creek from the taking of water for the subdivision.[3] Substantial public controversy existed and public pressure was brought to bear on the County to deny the application, thereby increasing the likelihood that an EIR and a public hearing would have been required prior to approval.[4]

Of separate but related importance is the fact that the West Sebastopol Specific Plan, which had already undergone significant public review before plaintiffs filed their subdivision application, and which became effective in 1980, placed greater restrictions on housing development. Plaintiffs' property was subject to that plan. The Herringtons filed their application after they learned that their proposal was not going to be expressly "grandfathered" in the Specific Plan. Plaintiffs sought to obtain final approval prior to the effective date of the Specific Plan, which once in effect restricted the density on their property to seven units. The specter of the West Sebastopol Specific Plan increased the likelihood that an EIR would have been required for plaintiffs' proposal.

If the Herringtons were required to prepare an EIR in order to receive approval of the County, there is little doubt that their subdivision application would not have been approved prior to the effective date of the West Sebastopol Specific Plan. And there is no doubt that the proposal for 32–lots was inconsistent with the seven lot density maximum in the Specific Plan. Thus, unless the Herringtons' property was considered under the density limitations in the earlier General Plan, or "grandfathered" in the Specific Plan, the effect of an EIR on the probability of approval of plaintiffs' proposal is significant. Other sources of potential delay, discussed below, are also applicable to this issue.

On March 4, 1980 the County adopted the West Sebastopol Specific Plan and its implementing zoning. The Herrington property was not specifically exempted from the Specific Plan. Although plaintiffs' land use expert testified that the Herringtons' property should have been considered under the zoning applicable at the time their application was filed on May 24, 1979, plaintiffs have cited no legal authority in support of this proposition. The legal question is whether a Specific Plan applies to subdivision applications that were submitted, but not granted final approval, prior to the adoption of the Specific Plan.

---

3. The water issues are discussed further below.

4. There was testimony regarding the opinions of various members of the Board of Supervisors, and regarding the relationships or animosities between plaintiffs and various members of the County planning staff. The court has given little weight to that evidence, except to note that public opposition was likely to increase the probability of an EIR being required.

The County urges a strict reading of Cal.Govt.Code § 66473.5 and § 66474 (West 1991), which precludes a public entity from approving a subdivision map unless it makes a specific finding of consistency with any adopted Specific Plan. *Woodland Hills Residents Assoc., Inc. v. City Council*, 44 Cal.App.3d 825, 837, 118 Cal.Rptr. 856 (1976). Minimum lot size, and therefore density, are applicable factors to be considered. Section 66473.[5]

■ California case law does not support plaintiffs' position that a common law concept of "grandfathering" existed at that time. Several cases have applied the zoning laws in existence at the time of approval of a subdivision to previously-filed applications, even though those laws changed after the date of application. *See Avco Community Developers Inc. v. South Coast Regional Commission*, 17 Cal.3d 785, 791–96, 132 Cal.Rptr. 386, 553 P.2d 546 (1976) *cert. denied and appeal dismissed*, 429 U.S. 1083, 97 S.Ct. 1089, 51 L.Ed.2d 529 (1977); *Woodland Hills*, 44 Cal.App.3d at 827–29, 837–39; *Spindler Realty Corp. v. Monning*, 243 Cal.App.2d 255, 265, 268–69, 53 Cal.Rptr. 7 (1966), *cert. denied*, 385 U.S. 975, 87 S.Ct. 515, 17 L.Ed.2d 437 (1966); *Anderson v. City Council*, 229 Cal.App.2d 79, 88, 40 Cal.Rptr. 41 (1964). In addition, there is no due process right to be free from changes in land use laws. *Lakeview Development Corp. v. City of South Lake Tahoe*, 915 F.2d 1290, 1295 (9th Cir.1990), *cert. denied*, — U.S. —, 111 S.Ct. 2890, 115 L.Ed.2d 1055 (1991).

■ Thus, in order to be considered under the density requirements of the earlier General Plan, rather than the Specific Plan, the County would have had to either: (1) approve plaintiffs' application prior to adoption of the West Sebastopol Specific Plan, (2) include their proposal within the Specific Plan and the accompanying study, or (3) specifically exempt their property from the Specific Plan. None of these means of "grandfathering" occurred.

Taken together, the necessity for an EIR and the approaching effectiveness of the West Sebastopol Specific Plan imposed serious obstacles to the approval of the Herringtons' proposed subdivision.

*Availability of Potable Water*

Substantial evidence was presented on whether plaintiffs could have developed a sufficient water supply to serve 32 lots. Plaintiffs would have to provide water to the lots through a mutual water system, drawing water from an alluvial aquifer under or near Salmon Creek. Pursuant to state water requirements, approximately 43 gallons per minute were needed to serve the proposed 32-lot development.

In 1978 plaintiffs hired a geologist, Mr. Boudreau, to evaluate the availability of water on the property. Mr. Boudreau concluded that sufficient water existed for approximately 20 units. A test was conducted on a well and approximately 30 gallons per minute were pumped for 72 hours. The quality analysis of this water, however, showed significant levels of contaminants exceeding state standards, including six times the acceptable level of arsenic. No further well drilling or testing occurred until January 1991, when a second well was drilled. This well was pumped at a rate of 20 gallons per minute for four hours and produced water within the drinking water standards for arsenic.[6]

The County contends that plaintiffs have failed to show sufficient quality and quantity of water because: (1) they have not proven the existence of 43 gallons per minute of potable water after a 72–hour pump test, as required by the state; (2) water in the 1978 well did not meet the quality standards; (3) insufficient testing of the 1991 well leaves doubt as to the availability of sufficient potable water; (4) plaintiffs' proposed water use could affect Salmon

---

5. The Cal.Govt.Code now provides that a local agency should apply the "ordinances, policies and standards in effect" at the time the application was deemed complete. § 66474.2(a). This amendment to the Government Code did not take effect until 1982 and is not applicable here.

6. Other easily treated contamination problems existed with the quality of the water pumped from the aquifer.

Creek during summer low-flow periods, in contravention of Sonoma County Code § 25–44(m)(8) (May 8, 1979); (5) plaintiffs proposed to use water from the Salmon Creek watershed in areas outside that watershed, in contravention of California law regarding riparian rights; and (6) depletion of Salmon Creek raised issues of water rights, requiring lengthy and complex state water rights proceedings and review under CEQA.

Although the Herringtons have not established their water supply by actually pumping potable water at 43 gallons per minute for a 72–hour period, there is little doubt that sufficient water to do so existed in the aquifer. It is also likely that several wells producing 20–30 gallons per minute could be drilled in the aquifer, which is sufficiently large to support multiple wells. This conclusion is supported by current reports prepared for the proposed Harmony Union School, which is located on an eastern portion of the property.

The quality of the water in the alluvial aquifer, however, is also of concern. Although the arsenic contamination found in the 1978 well was not found in the 1991 well, the 1991 well was pumped for only four hours and only a single water test was conducted. Recent pumping and testing of the 1978 well reveals that high levels of arsenic continue to be present, and such levels increased during the test pumping of the well. The short test of the 1991 well does not assure that arsenic might not appear after a longer period of time, when water from lower levels of the aquifer are drawn. The 1991 well is "upstream" from the 1978 well and may be arsenic-free. Given that both wells draw from the same aquifer, it is reasonable to question the availability of potable water, especially in light of the fact that plaintiffs did not conduct the required 72–hour test on the 1991 well.

Other issues raised by the County address the impact on Salmon Creek resulting from the projected water use by plaintiffs' subdivision. Mr. Boudreau originally testified that the aquifer is continuously recharged by rainfall, runoff from nearby hillsides, and Salmon Creek, which is hydrologically connected to the aquifer. After the County raised issues relating to the environmental impact on Salmon Creek, and potential application of County and State laws, plaintiffs recalled Mr. Boudreau, who qualified his earlier testimony. Mr. Boudreau testified that recharge would occur from sufficient rainfall and runoff from surrounding hills without affecting the creek.

Even if the court accepts Mr. Boudreau's qualified testimony, the distinction between a direct draw-down of the creek and use of rainwater and runoff is unclear. Given the proximity of the wells and the aquifer to Salmon Creek, it appears probable that the proposed development would take water either from the creek or from sources that would otherwise drain into the creek, thereby reducing the flow in the creek. This court need not actually decide whether water could be drawn from Salmon Creek to support the proposed subdivision. It is sufficient to note that a potential environmental impact was posed by the proposed use. This increased the likelihood that an EIR would have to be prepared addressing the potential effects of reduced flows in Salmon Creek. In fact, many of these issues were raised, and environmental impacts were identified, in an EIR conducted by the Harmony Union School District.

The remaining water issues raised by the County result in a similar conclusion. That is, without deciding the issues of County and State water law, the possibility that water rights might have to be adjudicated adds to the probability that plaintiffs faced potential delays that would have postponed final consideration of their proposal until after the West Sebastopol Specific Plan.

Plaintiffs have not shown that sufficient quantity or quality of water existed for their proposed development. Subsequent drilling and testing by plaintiffs and the Harmony School District indicate a likelihood of sufficient potable water. However, the County has raised a number of issues that remain unanswered. This court need not resolve all of these issues. It is enough to conclude that an EIR would be

required before the subdivision proposal would have been approved by the County.

*Adequacy of Soil Percolation*

In the initial notice to plaintiffs after the filing of their application, the County stated that the application was incomplete because percolation tests and soils profile analyses had not been submitted, as required by Sonoma County Code § 25–56(d)(2)(H) (May 8, 1979). Although plaintiffs were then advised not to pursue the percolation testing until the Planning Commission and Board of Supervisors resolved the consistency issues, plaintiffs conducted and submitted tests in August 1979.

At trial the County Public Health Department Supervisor and sanitarian, Mr. Holmer, noted problems with the testing that plaintiffs conducted on nearly half of the lots, including missing information for certain lots, improper testing on others, and yet other lots that would require further testing. In addition, some wet weather testing would be required on certain lots. According to Mr. Holmer, plaintiffs would have been forced to wait until December 26, 1979 to conduct the wet weather tests because of rainfall requirements for such testing.

The requirement of wet weather testing and the potential necessity to redraw lot lines and alter the subdivision proposal add to the probability of delay of final approval of the proposal until after the West Sebastopol Specific Plan. Final percolation requirements would have further delayed final approval. It is likely that with adjustments of lot lines, or the elimination of certain lots, sufficient percolation could have been proven for some level of subdivision. However, the potential for delay associated with the additional testing and lot adjustments indicates that it was even less likely that the proposed subdivision would have been approved by the County prior to the West Sebastopol Specific Plan.

*Application "on File" and the Stay of the Judgment*

Both parties produced evidence on the issue of whether the Herringtons actually had a subdivision application "on file" with the County in 1979. Plaintiffs made their initial filing on May 24, 1979. On June 6, 1979 the County Planning staff rejected plaintiffs' application as incomplete and "unacceptable for submission." Plaintiffs were notified that they could apply for a refund of their application fee. There is conflicting evidence as to whether the application papers were returned to the Herringtons or were retained by the County. The County also says that all action on such an application stops when an inconsistency determination is made, as was done in December 1979.

This dispute goes to the issue of whether, assuming that the County should have found the proposal to be consistent with the General Plan in December 1979, the application could have been approved before the West Sebastopol Specific Plan became effective. The issue of whether the Herringtons' application was on file throughout and after the consistency review period is not, however, central to the task at hand. The relevant questions are when it would have been completed, and whether final approval of the application would have occurred before March 4, 1980.

Plaintiffs argue that the County admitted that their application was on file and was close to completion when it applied for a stay of the judgment pending appeal of the jury verdict. In the application for a stay, the County argued that without a stay, "the defendant would be irretrievably damaged in that the property would likely be developed with a 32–unit housing project...." Upon review of the record, the court concludes that the stay application was directed primarily to the payment of the $2.5 million judgment. The County there argued that the judgment did not contain an injunction against the County that plaintiffs' proposal be deemed consistent with the General Plan. In the alternative, County counsel noted that "even if the declaration were to be viewed as an injunction that must be stayed pending appeal the standards are met in any event." The application then addressed the balancing test to be applied when considering the relative hardships in staying injunctive relief pending appeal. The alleged admission

quoted above followed the balancing analysis. This court does not consider that the alternative argument of the County was an admission that a 32-lot subdivision was ready for approval. The statement by the County was addressed to the possibility that the judgment was injunctive. However, the judgment did not enjoin the County from finding the proposed subdivision inconsistent with the General Plan; it invalidated the earlier inconsistency finding by the Board of Supervisors.

*Conclusion Re Probability*

■ In conclusion, weighing the above and other factors as a whole, this court concludes that the Herringtons' subdivision proposal had a one in three, or a 33%, probability of approval. Had the County acted expeditiously and fairly on the proposal, it is possible that the Herringtons might have been able to establish the necessary requirements before March 4, 1980 or might have been "grandfathered." However, taking into consideration the probability that an EIR would have been required to address environmental effects of the project, as well as other sources of potential delay, it is not likely that the proposed subdivision would have been approved prior to the effective date of the West Sebastopol Specific Plan or would have been "grandfathered." Once that Plan and its accompanying zoning took effect, plaintiffs' proposal would probably not have been approved as proposed. It would have been subject to the reduced density defined in that Plan.

Accordingly, the value of (a) is 33%; and the value of (b) is 67%.

### C.

■ The next factor in the damages formula is the length of time that the Herringtons were delayed by the unconstitutional acts of the County. This court has already ruled that the starting date for the period of delay is December 11, 1979, when the Board of Supervisors found the subdivision proposal inconsistent with the 1978 General Plan.

Plaintiffs argue for a time period of nine and one quarter years, the end-date being the passage of the 1989 General Plan. Under the 1989 General Plan, the zoning on the subject property was changed to a maximum of ten units. In contending for that time period, plaintiffs assert a theory that it was not economically viable to develop the property as a subdivision prior to the 1989 General Plan's rezoning. This court has already rejected plaintiffs' economic viability argument, as being contrary to the law of the case expressed in the Ninth Circuit's decision. By arguing no economic viability, plaintiffs are essentially reasserting a theory of the permanent taking of the use of their land. However, as noted above, plaintiffs dropped their taking claim at the first trial, and the West Sebastopol Specific Plan and the 1979 General Plan were unaffected by the judgment in this case. 834 F.2d at 1488. Given the validity of the General and Specific Plans, plaintiffs' economic viability theory must be rejected as a means of measuring the duration of temporary taking.

■ The County argues that the delay period ended on March 4, 1980 when the West Sebastopol Specific Plan and its implementing zoning were enacted. In the alternative, the County suggests a delay period between 12 and 18 months based on either: (1) the California Streamlining Act, Cal.Govt.Code § 65920, (2) the normal time required to process a subdivision map application, or (3) the time it would have taken the Herringtons to pursue a writ of mandate in state court.

This court concludes that the eighteen-month period is reasonable. It is supported by both the evidence and analogous California law. Although the adoption of the West Sebastopol Plan in March 1980 adversely impacted plaintiffs' property, there were alternatives available under subdivision procedures, and plaintiffs were entitled to a proper consideration of their proposal within a legal and practical time frame.

Factor (t) is therefore eighteen months.

### D.

■ The parties presented evidence on the value of (R), the rate of return to be

applied to the lost value for the period of time the Herringtons were delayed in proceeding with their subdivision. Plaintiffs argue a 15.7% rate of return, based on an investment profile presented by their economist. The County proposed that it be the rate on 52–week treasury certificates for the applicable time period. The County also argued that income tax considerations be taken into account to reduce the amount of damages.

Plaintiffs' expert, Mr. Hansen, testified that had the Herringtons' invested $810,000 in a broad-based investment strategy, represented by several mutual fund-type investments, they would have received $2,331,000 in return after a period of nine years and three months. Mr. Hansen's calculations cannot be broken down and applied to a shorter time period, although the "multiplier" used by Mr. Hansen could be applied to a smaller lost value figure. Because this court has not adopted plaintiffs' taking theory and has adopted an eighteen month period, this evidence is now of little value. However, even were the court to accept plaintiffs' nine and one quarter year period of delay, the rate of return suggested by Mr. Hansen is excessive. The Herringtons continue to own the property, which has appreciated substantially since 1979. The rate of return presented by plaintiffs assumes that the property is invested in *other* investment vehicles, such as stocks and bonds. According to this approach, the Herringtons would be permitted to benefit from the appreciation of the property, as well as the appreciation of alternative investment assets.

An interest rate applied to the lost value of the property is the more appropriate measure of recovery. 834 F.2d at 1505. Application of a rate of interest also eliminates the double-recovery that occurs when the same capital is applied to two different growth-oriented assets.

■ Title 28 U.S.C. § 1961 provides for the use of 52–week U.S. Treasury Bills as the rate of interest for a money judgment in a civil case. Although this statute does not control in this case, it is a reasonable means of determining the rate of return for the duration of the delay. The evidence indicates that the interest rate during that eighteen month period averaged approximately 13%. Factor (R) is therefore 13% per year.

■ The County has also requested the court to consider the tax consequences associated with an award of damages. The County argues that § 1983 damages need not be included in plaintiffs' gross income. *Wulf v. City of Wichita*, 883 F.2d 842, 871–73 (10th Cir.1989); *Bent v. Commissioner of Internal Revenue*, 835 F.2d 67, 70 (3d Cir.1987); *Johnston v. Harris County Flood Control*, 869 F.2d 1565, 1579–80 (5th Cir.1989). Had the Herringtons realized income from their real property in 1979 and 1980, and then invested that income to produce income throughout the period of delay, they would have had to pay taxes on that income stream. 26 U.S.C. §§ 61(a)(3), (7), (13) (1991). Thus, the County argues that unless plaintiffs recovery is reduced to reflect the taxes that would have been due, plaintiffs receive a windfall.

Plaintiffs' recovery in this case is for delay in receipt of income from the development of their property. That delay is measured by a rate of interest on the lost principal amount. The cases finding § 1983 damages excludable from taxation analogize to damages in a tort action received for personal injuries. Personal injury damages are excludable from personal income tax pursuant to 26 U.S.C. § 104(a)(2) (1990). It is not apparent whether the Herringtons' recovery in this case will be subject to taxation. If this court were to reduce plaintiffs' recovery in anticipation of the non-taxability of the damages award, plaintiffs could end up being taxed twice. Although three circuit courts have held that § 1983 damages are non-taxable, there are no Ninth Circuit cases holding that a district court should consider the tax consequences of a damages award outside the context of recovery under the Federal Tort Claims Act. *See Felder v. United States*, 543 F.2d 657, 669–70 (9th Cir.1976).

This court cannot conclude that plaintiffs' recovery will not be subject to taxa-

tion. Therefore, it would be unjust to plaintiffs to reduce their recovery in this case based on potential tax consequences.

### E.

 The Ninth Circuit left open the possibility that plaintiffs might recover their increased costs of development as one component of their damages for delay. 834 F.2d at 1505.

Plaintiffs presented evidence from an engineering expert that the cost of constructing improvements for a 32-lot subdivision increased by $534,922 between December 1979 and March 1989. But the evidence does not indicate how much costs increased, if at all, during the eighteen month period after December 1979. And some of those increased costs could not be recovered, because the Herringtons would not have incurred any development costs until after approval of their *final* map, which would be well after December 11, 1979.

The court therefore concludes that the value of (c) is zero.

### III.

The court's formula is:

$$[(aX + bX) - Y] Rt + ac$$

Inserting the values found above, the damages are calculated as follows:

$$[(.33 \times \$1.3 \text{ million} + .67 \times \$490,000) - \$490,000]$$

$$\times .13 \times 1.5 \text{ yrs.} + 0 =$$

$$\underline{\$52,123.50}$$

### IV.

 Those are the damages that the County caused to plaintiffs as of June 1981. Plaintiffs request an award of prejudgment interest on that sum. The Court of Appeals left that question open; 834 F.2d at 1506 and fn. 23.

An award of prejudgment interest in a case such as this is discretionary. However, the Ninth Circuit has cautioned that the exercise of that discretion should recognize that prejudgment interest is an element of compensation and is not a penalty. *Western Pacific Fisheries, Inc. v. S.S.*

*President Grant,* 730 F.2d 1280, 1288 (9th Cir.1984). The circuit stated the guiding principle in *Wessel v. Buhler,* 437 F.2d 279, 284 (9th Cir.1971) as follows: "Whether interest will be awarded is a question of fairness, lying within the court's sound discretion, to be answered by balancing the equities."

This court believes that the discretion should be exercised here in favor of plaintiffs. The Ninth Circuit affirmed the finding of liability made in the first trial, as well as this court's order invalidating the County's inconsistency determination. Since the judgment in the first trial in 1986, plaintiffs' dollar damages have been reduced by the Ninth Circuit and by this court. However, the decision on liability has always remained in their favor. The damages issue has been only the amount of plaintiffs' recovery. And even the County appears to concede that an award of prejudgment interest from June 1981 through September 1986 is appropriate. The County has made several arguments against prejudgment interest. This court need not reply to all of those arguments; but rather, it is sufficient to say that the court believes that those arguments are offset by the fact that the issue of liability has remained determined in plaintiffs' favor since 1986.

 The rate of interest is also in dispute. Plaintiffs base their claim on a 13% interest rate. This court believes that that rate is too high. The Ninth Circuit has held that awards of prejudgment interest should be at the interest rate on short-term risk-free obligations. *Western Pacific Fisheries, Inc.,* 730 F.2d at 1289. The appropriate rate is defined by 28 U.S.C. § 1961, which results in the rate being determined by the U.S. Treasury bill rates in effect at the time. The rate for one year treasury bills has been established in this case by the schedule admitted into evidence as Exhibit CR. That schedule runs through 1990, and the court finds that the 1991 rate is 6.16%.

The court therefore determines that plaintiffs are entitled to an award of prejudgment interest on the principal sum of

$52,123.52, for the period from June 1, 1981 through the date of this judgment, compounded annually. The court has calculated an average interest rate of 9.5% from 1981 to 1986, and an average rate of 7.25% from 1986 to date. The addition of that interest to the principal sum of $52,123.50 results in a total judgment of $121,472.06.

## V.

Judgment will be entered accordingly. Plaintiffs may file an application for costs and attorneys' fees, which defendants may oppose.

IT IS SO ORDERED.