BASS ENTERPRISES PRODUCTION
CO. et al., Plaintiffs,

v.

UNITED STATES of America, Defendant.

No. 95–52 L.

United States Court of Federal Claims.

Feb. 7, 2001.[1]

---

1. This opinion was issued unpublished on February 7, 2001. Defendant filed a motion pursuant to RCFC 52.1(b). We granted that motion, and ask that the Clerk reissue the opinion in published form.

Harold L. Hensley, Jr. and James M. Hudson, Hinkle, Hensley, Shanor & Martin, L.L.P., Roswell, New Mexico, for plaintiffs.

Susan V. Cook and Kristine S. Tardiff, United States Department of Justice, Washington, D.C., for defendant.

## OPINION AND ORDER

HODGES, Judge.

We have ruled that plaintiffs suffered a temporary taking of their property. *Bass Enterprises Production Co. v. United States*, 45 Fed.Cl. 120 (1999).[2] Shortly after the liability opinion was issued, the parties asked the court to enter an Order establishing the standard to use in valuing the temporary taking. We agreed to rule on the measure of damages to aid the parties' settlement efforts. Ultimately the parties could not agree and we proceeded to trial on the method of calculating fair rental value. The second damages phase will be limited to testimony on the underlying numbers.

This case involves the right to drill, mine, extract, remove, and dispose of all the oil and gas on the subject property. Plaintiffs' lease

runs until the resources are depleted. The United States did not take oil or gas from the land, but merely delayed plaintiffs' taking of those resources. *Bass*, 45 Fed.Cl. at 124. Eventually plaintiffs would get all of it. We ruled therefore that the only measure of damages that would compensate plaintiffs without resulting in a double recovery or a windfall was the interest they would have earned on oil and gas profits during the delay.[3] Plaintiffs argue that such a measure would not be equitable because they would have suffered a net loss during the four-year taking period. Specifically, the initial investment costs would result in a negative number. According to plaintiffs, there would be no profits on which to calculate interest.

## DISCUSSION

■ "The usual measure of just compensation for a temporary taking ... is the fair rental value of the property for the period of the taking." *Yuba Natural Resources, Inc. v. United States*, 904 F.2d 1577, 1581 (Fed. Cir.1990); *see also Kimball Laundry Co. v. United States*, 338 U.S. 1, 7, 69 S.Ct. 1434, 93 L.Ed. 1765 (1949). The parties agree that this is the applicable standard, but they disagree on the method that should be applied. The damage model that we suggested focused on compensating plaintiffs for what they actually lost. Plaintiffs were delayed in their development efforts. A hypothetical lessee would have rented this property to develop, just as Bass did. But if the property had been developed, less oil and gas would have been available for plaintiffs if the property were returned. So the question is, what would Bass have charged to delay development for four years. We agreed to hear evidence on other methods of calculating fair rental value at trial.

### I.

Plaintiffs contend that the method of damages suggested by this court would yield zero damages. Plaintiffs' expert, Dr. Kalt, testified that large up-front investment costs would have offset any income during the first

---

**2.** Additional case history is set out in *Bass Enterprises Production Co. v. United States*, 35 Fed.Cl. 615 (1996).

**3.** *See* Ruling on Measure of Damages dated July 14, 1998; *see also Bass*, 45 Fed.Cl. at 120.

few years. Moreover, plaintiffs rejected this method because they said it did not approximate fair rental value. They proposed two other methods.

The first method that plaintiffs proposed was referred to as the "no hindsight" approach. This method presumes that a willing buyer and a willing seller were negotiating "a rental agreement under the conditions that the length of the taking is unknown . . . [a]nd . . . you don't have the benefit of knowing how history will evolve after August of 1994," as Dr. Kalt described it. "What I would charge you would be the interest I could earn by, instead of renting it to you, . . . selling the asset for its market value and investing the money. I would charge you essentially interest on the profit stream that can be generated." To arrive at this number, Dr. Kalt used the fair market value in August 1994 of $8.94 million multiplied by an interest factor of 10.07%. He calculated a monthly rental payment of $75,022.[4] The rental payment ends when the property is returned, according to Dr. Kalt. Dr. Kalt testified that the interest factor is determined by "a rate of return that the project needs . . . in order to be profitable."

The fair market value that Dr. Kalt used is based on an earlier decision by this court in a permanent taking context. *See Bass,* 95–52L, slip. op. at 5 (Fed.Cl. June 20, 1996). Fair market value is the proper measure of just compensation where land is taken permanently by the United States. *Yuba,* 904 F.2d at 1580. As defendant correctly points out, however, temporary takings valuation is not a derivative of permanent taking value. The Supreme Court has held that "fair compensation for a temporary possession of a business enterprise is the reasonable value of the property's use." *United States v. Pewee Coal Co.,* 341 U.S. 114, 117, 71 S.Ct. 670, 95 L.Ed. 809 (1951) (citing *Kimball Laundry,* 338 U.S. at 1, 69 S.Ct. 1434). Interest on the fair market value of the property does not provide a method that accurately reflects the reasonable value of the property's use.

Plaintiff provides no case support for such a method.

The second method that plaintiffs propose to determine fair rental value is the "hindsight" approach. Dr. Kalt testified that under this approach we "know[ ] when the taking ends . . . and . . . you are allowed to take into account the actual evolution of the information underlying the production process, the prices, the geology, . . . [and the] information available as of the date at which the property is returned." Plaintiffs' expert contends that the rental calculation must recognize that plaintiff had to "wait for dollars, that is, the production profile doesn't start until sometime after the taking; and the asset that you get back is worth less than the asset that was taken from you." Instead of the asset's being worth $8.94 million in August 1994, hindsight provides the ability to take into account oil prices for the period of dispossession, according to Dr. Kalt. The present value in 1994 is representative of that declining world. Thus, the fair market value in August 1994 under this method is $3.59 million, and when the asset is returned the fair market value is $2.33 million.[5] The rental payment "preserves and gives back to Bass and Enron the value of what was taken [which] is the present value of the sum of the rental payments plus the $2.33 million. That's a monthly rental payment of $44,703." Dr. Kalt stated that plaintiffs are being "compensate[d] not only for the missed interest but for the depreciation of the value of the asset."

■ This method is based in part on the value of the property that is returned at the end of the taking period. Plaintiffs' expert testified that "[t]o keep the party whole, the value of the property at the time of taking is going to have to equal the value of the property in present value at the time it is returned plus the rental payments . . . ." We disagree. The trial court in *Yuba* found that "[j]ust compensation for a temporary taking does not take into account the fair market value of the property either before or after it

---

4. The $8.94 million fair market value was determined by this court in a prior trial. *Bass Enterprises Production Co. v. United States,* No. 95–52L, slip. op. at 5 (Fed.Cl. June 20, 1996).

5. The numbers are based on plaintiff's expert, Mr. Platt.

is taken." *Yuba Natural Resources, Inc. v. United States,* No. 480–80L, slip op. at 5 (Cl.Ct. March 9, 1989). The appellate court recognized that the property was not permanently taken. The Supreme Court in *Kimball Laundry* stated,

> Indeed, if the difference between the market value of the fee on the date of taking and that on the date of return were taken to be the measure [of just compensation], there might frequently be situations in which the owner would receive no compensation whatever because the market value of the property had not decreased during the period of the taker's occupancy.

338 U.S. at 7, 69 S.Ct. 1434. Thus, it would be improper for this court to obtain a rental calculation based in part on the difference in the market value of the property at the time of taking in August 1994 and return of the property in May 1998.

### II.

Defendant argued that neither method selected by plaintiffs would produce an accurate rental value figure. Defendant's expert stated that "[a]t the time [of] the temporary taking the property did not constitute an income producing property...." According to Mr. Dorchester, rental value is the interest on cash flow profits. He looks at the present value of the cash flows using a risk rate assessed as of the date of taking. "[T]he risks and uncertainties as of the date of taking would then determine what [someone] would pay for those cash flows." Mr. Dorchester employed a method he called a "calculation of the interest on profits due to the delay." He calculated the present worth of the cash flows as of August 22, 1994. Then, using the same cash flows, he calculated the present worth of those cash flows deferred by 45 months. "[T]he effect of the temporary taking was to ... defer that income stream by 45 months." The asset should "properly be looked at as of August 22, 1994, with exactly the same cash flows for the non-deferral period and the deferral period, so there is no loss in the asset. It is exactly the same asset but it's been deferred by 45 months." Mr. Dorchester testified that the preferred method is to look at cash

flows with no hindsight; in this case as of August 22, 1994.

### III.

■ We recognize that the measure of compensation for a temporary taking is fair rental value. *Yuba,* 904 F.2d at 1581. Yet, this case is unlike many temporary takings cases. For example, in *Kimball Laundry,* the United States took an existing laundry business for use in the war effort. 338 U.S. at 3, 69 S.Ct. 1434. Kimball lost the use of its business during the taking period. It could never recover the rents that would have accrued during that time. This case involves the taking of a right to develop and drill for natural resources, however. The resources will remain in the ground until plaintiffs are permitted to develop them. Bass has not lost any of the oil and gas. Bass has lost time.

"It is conceivable that an owner's indemnity should be measured in various ways depending upon the circumstances of each case and that no general formula should be used for the purpose." *United States v. Miller,* 317 U.S. 369, 373–374, 63 S.Ct. 276, 87 L.Ed. 336 (1943). We are compensating plaintiff for "the amount which the owner lost as a result of the taking." *Yuba,* 904 F.2d at 1581 (citing *First English Evangelical Lutheran Church v. Los Angeles,* 482 U.S. 304, 319, 107 S.Ct. 2378, 96 L.Ed.2d 250 (1987)). Both plaintiffs and defendant utilize cash flows in their analysis for determining a rental payment. Dr. Kalt testified that "there is absolutely no disagreement within the methodology that a given set of cash flow projections [show] a drop in value as a result of the pushing out of the access." Similarly, defendant's expert testified that rental value is determined by taking "the entire set of the cash flows for the entire life of the well and that way we have amortized those capital outlays through our present worth calculations ..." Mr. Dorchester determines the present worth of interest for the cash flow projection period both with delay and with no delay. The difference is the "interest on profits differential for the period of the 45–month delay."

Fair rental value in this case approximates the difference in interest on the cash flows. We used the term "profits" in earlier Orders, but did not define that term. The parties agree that initial investment costs in these circumstances reduce any profits to a negative number. Therefore, Bass' loss is limited to the difference between the interest on the present value of the cash flows with and without delay. We do not rule on the cash flow amounts at this time, or the interest factor to be applied. This opinion is limited to the method of determining rental value.

## CONCLUSION

Bass suffered a temporary taking. Fair rental value is the proper measure of just compensation. The parties will attempt to stipulate applicable cash flow amounts and the interest factor to be applied. If no stipulation can be reached, trial begins on July 23, 2001 in Albuquerque, New Mexico.