2002 SD 90

**SDDS, INC., a South Dakota
Corporation, Plaintiff
and Appellant,**

v.

**STATE of South Dakota, Defendant
and Appellee.**

Nos. 21428, 21448.

Supreme Court of South Dakota.

Argued March 19, 2001.

Reassigned May 1, 2002.

Considered on Supplemental
Briefs June 19, 2002.

Decided July 24, 2002.

James E. McMahon of McMahon Law Office, Sioux Falls, Jeremiah D. Murphy,

David J. Vickers of Boyce, Murphy, McDowell & Greenfield, Sioux Falls, Edward T. Lyons, Jr., and Thomas J. Burke, Jr., of Jones & Keller, Denver, Colorado, for plaintiff and appellant.

William P. Fuller and James E. Moore of Woods, Fuller, Shultz & Smith, Sioux Falls, Michael J. Schaffer of Davenport, Evans, Hurwitz & Smith, Sioux Falls, for defendant and appellee.

KONENKAMP, Justice (on reassignment).

[¶ 1.] South Dakota Disposal Systems, Inc. (SDDS) appeals the circuit court's order granting a new trial. A Hughes County jury awarded SDDS $10.1 million in damages against the State of South Dakota in an inverse condemnation action, resulting from the voters' disapproval in a 1992 referendum of a legislatively authorized waste disposal facility. The trial court later vacated the judgment and ordered a new trial, concluding that it had incorrectly instructed the jury. We hold that the court submitted to the jury the issue of damages under improper instructions on the method of calculation. Consequently, we affirm and remand with specific direction for computing damages.

## A.

### Background

[¶ 2.] This appeal is one more chapter in a long series of cases arising out of SDDS's attempt to develop a large-scale multi-state solid waste disposal facility (the Lonetree site) near Edgemont, South Dakota. Litigation on this matter between SDDS and the State of South Dakota has proceeded in both state and federal courts. To avoid confusion, we will refer to the decisions of this Court as SDDS I—V and to the decisions of federal courts as Lonetree I—V. Accordingly, the state cases are:

SDDS I, 472 N.W.2d 502 (S.D.1991);
SDDS II, 481 N.W.2d 270 (S.D.1992);
SDDS III, 502 N.W.2d 852 (S.D.1993);
SDDS IV, 507 N.W.2d 702 (S.D.1993); and
SDDS V, 1997 SD 114, 569 N.W.2d 289.
The federal cases are:
Lonetree I, 994 F.2d 486 (8th Cir.1993);
Lonetree II, 843 F.Supp. 546 (D.S.D. 1994);
Lonetree III, 47 F.3d 263 (8th Cir.1995);
Lonetree IV, 97 F.3d 1030 (8th Cir. 1996), and
Lonetree V, 225 F.3d 970 (8th Cir.2000), cert. denied, 532 U.S. 1007, 121 S.Ct. 1733, 149 L.Ed.2d 658 (2001).
The factual background of the instant case has been set forth in those previous opinions. We provide a brief summary here.

[¶ 3.] In October 1988, SDDS purchased 1200 acres of rangeland near Edgemont in Fall River County, located in southwestern South Dakota. The company was interested in operating a balefill facility (Lonetree) that would eventually hold a total of 7.75 million tons of municipal solid waste (MSW).

[¶ 4.] On November 17, 1988, SDDS applied to the South Dakota Department of Water and Natural Resources for an initial one-year permit to operate Lonetree and process an initial 300,000 tons of MSW. The Department recommended against granting the permit. SDDS appealed to the Board of Minerals and Environment (BME), which, after a hearing, granted the permit in September 1989. A public interest group, Technical Information Project, intervened and appealed to circuit court, which affirmed the decision to grant the one-year permit. On June 26, 1991, we reversed and remanded the matter to the BME for more specific findings regarding the public interest in and the environmental safety of Lonetree as required by our statutes. SDDS I, supra.

[¶ 5.] Meanwhile, in March 1990, SDDS applied for a five-year renewal permit with the Department and the BME to allow it to dispose of 7.75 million tons of MSW, ninety percent of which was expected to come from other states. The BME conducted additional hearings and issued the five-year renewal permit to SDDS on December 7, 1990.

[¶ 6.] While SDDS I was wending its way through the judicial system, a parallel challenge was taking shape in the political sphere. An initiative drive conducted by the Surface Mining Initiative Fund collected sufficient signatures to place an initiated measure on the November 6, 1990, general election ballot. The initiative required that all MSW facilities in South Dakota processing more than 200,000 tons per year obtain legislative approval. This measure was approved by the electorate and became law on November 22, 1990. In February 1991, the South Dakota Legislature passed a bill approving the operation of Lonetree. This legislation, Senate Bill 169 (SB 169), was signed by the Governor and took effect on July 1, 1991.

[¶ 7.] In May 1991, a referendum petition was filed with the Secretary of State's office. This petition sought to overturn the legislative authorization for Lonetree by submitting the matter to a statewide vote in November 1992. In light of these various challenges and roadblocks, SDDS had earlier laid off workers and ceased site preparations, while continuing its legal and political battle to obtain a valid permit.

[¶ 8.] In February 1992, we decided SDDS II, ruling that SDDS was not authorized to start operations until after the 1992 referendum. Thereafter, in the November 1992 general election, the South Dakota electorate rejected the Legislature's authorization. Consequently, SDDS stopped all work on site preparation.

SDDS then sought to overturn the referendum in federal court. In *Lonetree III*, the Eighth Circuit Court of Appeals found that the referendum was improper state protectionism violating the dormant aspects of the Commerce Clause of the United States Constitution. U.S. Constitution, Article I § 8.[1]

[¶ 9.] At that point, SDDS brought the present suit, a takings or inverse condemnation action, in circuit court. The court initially granted summary judgment to the State on the grounds that SDDS had no protected property right in operating Lonetree because the grant of the five-year renewal permit was premised on an initial permit that this Court had ruled was void *ab initio. See SDDS IV.*

[¶ 10.] At the same time, SDDS sought injunctive relief in federal court to bar the State from relitigating the property issue.

SDDS argued that in *Lonetree III* the Eighth Circuit recognized SDDS's property right in the five-year permit. The federal district court denied the injunction. *SDDS v. State*, Civ. No. 91–5121 (DSD May 28, 1996). SDDS then appealed to the Eighth Circuit, seeking a writ of mandamus requiring the district court to bar the State from relitigating the issue of the extent of SDDS's property rights affected by the referendum.

[¶ 11.] The Eighth Circuit, analyzing the mandamus action as an appeal, ordered the district court to issue an injunction barring South Dakota from relitigating in state court the following issues: (1) did SDDS have an entitlement to a permit to operate the Lonetree facility? and (2) was the referendum the proximate cause of SDDS's dissolution? *Lonetree IV*, 97 F.3d at 1042.[2] Thereafter, in *SDDS V*, we

---

1. In *Lonetree III*, the Eighth Circuit explained the Supreme Court's two-step approach to the dormant Commerce Clause. The first step is to determine whether the challenged measure discriminates against out-of-state articles, *i.e.*, is a protectionist measure. If the measure is found to be protectionist, it will be ruled unconstitutional unless it is found to pass muster under the appropriate level of scrutiny. In the first step, the Eighth Circuit found the referendum to be discriminatory against out-of-state commerce, both in purpose and in effect; then, in the second step, the court applied a strict-scrutiny test, rather than a more flexible balancing test. Under the strict-scrutiny test, the State had the burden of demonstrating *both* that the referendum provided local benefits *and* that a nondiscriminatory alternative to the referendum was unavailable. The court found that the referendum failed both prongs of the strict-scrutiny test: first, it did not further the legitimate goal of environmental safety (a local benefit); second, a nondiscriminatory alternative was available in South Dakota, namely, discussion and review of environmental issues in, and eventual passage of relevant laws by, the State Legislature, a constitutional process designed to minimize the distorted reasoning and protectionist rhetoric that characterized

the referral of SB 169 to a statewide vote. *But see SDDS V*, 569 N.W.2d 289, 1997 SD 114, ¶ 14 n.9.

2. In *SDDS IV*, we ruled that, after our decision in *SDDS I*, no valid one-year permit existed to be renewed; therefore, the five-year permit was void *ab initio*. 507 N.W.2d at 702. The Eighth Circuit reasoned that, because SDDS had met all the requirements for an initial permit, it held a property right in the permit, that the subsequent five-year permit was not flawed, and that SDDS was entitled to operate the facility for that five-year period. The Eighth Circuit noted that, during the time period that the results of initiative and referendum prevented Lonetree from proceeding, the BME (on remand from *SDDS I*) made specific findings that the Lonetree facility was environmentally safe and in the public interest. The revised BME findings also contained a specific conclusion that all requirements for the permit had been met. The Eighth Circuit further noted that, in *Lonetree III*, in response to the State's argument that the permit had been revoked and was void, it had stated:

 if this court were to ignore South Dakota's intermediary actions and look only to the

held that, under principles of comity, res judicata, and collateral estoppel, we were bound by the judgment of the Eighth Circuit in *Lonetree IV.* 1997 SD 114 at ¶¶ 14–18, 569 N.W.2d at 293–95. *But see id.* at ¶ 14, n9.

[¶ 12.] This case was thus remanded to the circuit court to determine what damages, if any, SDDS suffered as a result of the taking of its property through the referendum. This takings period covered the time between July 1, 1991, the date SB 169 would have been effective and would have permitted SDDS to operate had there been no referendum, and February 6, 1995, the date the Eighth Circuit found the referendum to be unconstitutional. A jury trial commenced on March 22, 1999, in Hughes County and ended on April 6, 1999, with a jury award of $10.1 million in damages to SDDS.

[¶ 13.] Motions for judgment notwithstanding the verdict and for a new trial were filed by the State. The trial court granted the motion for a new trial, explaining in a memorandum opinion that it believed jury instruction 19 had allowed the jury improperly to award consequential damages to SDDS. "It is a well-settled principle of Fifth Amendment taking law . . . that the measure of just compensation is the fair value of what was taken, and not the consequential damages the owner suffers as a result of the taking." *Yuba Natural Resources, Inc. v. United States,* 904 F.2d 1577, 1581 (Fed.Cir.1990) (citation omitted).[3]

[¶ 14.] Finally, for purposes of review and ready reference, we set forth, in chronological order, the holdings in the previous ten cases. The reader will note that there is a significant interplay (if not a tension) between the state and federal holdings.

● *SDDS I (1991):* The South Dakota Supreme Court, Amundson, J., held that (1) the BME properly denied the request of intervenor Technical Information Project for an environmental impact statement; (2) SDDS's *ex parte* contacts with the State Department of Water and Natural Resources did not deprive the intervenor or the general public of due process; and (3) the Board's findings were insufficient to support its determinations that the proposed Lonetree facility was in the public interest and was environmentally safe.

● *SDDS II (1992):* The South Dakota Supreme Court, Miller, C.J. (on reassignment), held that legislation passed pursuant to authorization in an initiative measure, authorizing operation of the Lonetree facility, would not become effective until after the referendum election, where referendum petitions were properly filed.

● *Lonetree I (1993):* The Court of Appeals, Magill, Circuit Judge, held that SDDS's suit challenging constitutionality of state referendum was not barred (1) by the doctrine of *res judicata* or (2) by the doctrine of collateral estoppel.

● *SDDS III (June 30, 1993):* The South Dakota Supreme Court, Miller, C.J. (on reassignment), held that SDDS's suit against state officials was properly venued only in Hughes County, the

result, it would reward South Dakota for acting unconstitutionally. Moreover, the administrative permit was voided due to a procedural defect, not because of any finding that the Lonetree facility was environmentally dangerous.

*Lonetree IV,* 97 F.3d at 1039.

**3.** The circuit court also concluded that the *Bass* model of damages more closely resembled SDDS's claimed losses than the *Nemmers* model. *See* note 11.

situs of the state capital and of previous similar actions involving SDDS.

- *SDDS IV (November 3, 1993):* The South Dakota Supreme Court, Henderson, J., held that (1) *SDDS I* revoked SDDS's permit and (2) renewal of the permit was void *ab initio*.

- *Lonetree II (1994):* The federal district court, Battey, J., held that (1) the state referendum did not violate the due process rights of plaintiff SDDS, which did not have a valid permit to operate the Lonetree facility; (2) the state referendum did not violate the dormant commerce clause of the U.S. Constitution; and (3) the state referendum did not violate the equal protection clause.

- *Lonetree III (1995):* The Court of Appeals, Magill, Circuit Judge, held that the state referendum was invalid under the dormant commerce clause of the U.S. Constitution.

- *Lonetree IV (1996):* The Court of Appeals, Magill, Circuit Judge, held that: (1) the mandamus petition would be construed as a notice of appeal; (2) the Eleventh Amendment did not bar suit in federal court for injunctive relief to prohibit South Dakota from relitigating issues previously decided in federal court; (3) the relitigation exception to the Anti–Injunction Act permitted injunctive relief; and (4) the district court's denial of injunctive relief was an abuse of discretion.

- *SDDS V (1997):* The South Dakota Supreme Court, Konenkamp, J., held that *Lonetree IV* barred South Dakota from arguing that SDDS had no legitimate entitlement to a permit and prevented the State from further litigating whether SDDS had a property right that could have been threatened by an unconstitutional taking.

- *Lonetree V (2000):* The Court of Appeals, McMillian, Circuit Judge, held that: (1) the State could not rely on the rule authorizing relief from a void judgment to obtain relief, on Eleventh Amendment grounds, from prior district court orders; (2) the district court did not abuse its discretion in declining to award the developer's entire fee request; and (3) the Court of Appeals would not recall its mandate directing the district court to enjoin South Dakota from relitigating issues, despite the state circuit court's alleged misconstruction of the federal injunction.

## B.

### Issues Presented and Standard of Review

[¶ 15.] In this appeal, we confront the following issues: (1) Is the State protected by sovereign immunity under the Eleventh Amendment? (2) Did the circuit court err in granting a new trial? (3) Did the court err in its calculation of prejudgment interest due on the jury verdict? We need not reach the third issue because we uphold the circuit court's decision to vacate the verdict and grant a new trial.

[¶ 16.] A court may grant a new trial for errors made at trial. SDCL 15–6–59(a); *State v. Springer–Ertl*, 2000 SD 56, 610 N.W.2d 768. In this case, the basis for granting a new trial was an error in the jury instructions. SDCL 15–6–59(a)(7) provides:

A new trial may be granted … for any of the following causes:

\* \* \*

(7) Error of law occurring at the trial; provided, that in the case of claim of error, admission, rejection of evidence, or instructions to the jury or failure of the court to make a finding or conclusion

upon a material issue which had not been proposed or requested, it must be based upon an objection, offer of proof or a motion to strike. The State properly objected to the instructions given.

■■■ [¶ 17.] A grant or denial of a new trial is ordinarily reviewed under the abuse-of-discretion standard. An abuse of discretion occurs only if no judicial mind, in view of the law and the circumstances of the particular case, could reasonably have reached such a conclusion. *Morrison v. Mineral Palace Ltd. Partnership*, 1999 SD 145, ¶ 5, 603 N.W.2d 193, 195 (citations omitted). A grant of a motion for a new trial is given greater deference on review than is a denial of the motion. *Springer–Ertl*, 2000 SD 56 at ¶ 9, 610 N.W.2d at 770 ("We require a clearer showing of abuse of discretion when a new trial was granted than when it was denied.") (quoting *Fullmer v. State Farm Ins. Co.*, 498 N.W.2d 357, 361 (S.D.1993)).

■■■ [¶ 18.] On the other hand, jury instructions are statements of the law governing the case. Whether an instruction is erroneous is a legal question, and granting a new trial for error in instructions is reviewed, not for abuse of discretion, but for legal error. Charles Alan Wright, Federal Courts § 95 (5th ed.1995). Questions of alleged legal error are reviewed *de novo*. *See U.S. v. State*, 1999 SD 94, ¶ 8, 598 N.W.2d 208, 211; *Dunes Hospitality, L.L.C. v. Country Kitchen Intern., Inc.*, 2001 SD 36, ¶ 7, 623 N.W.2d 484, 488. This Court has so ruled in the context of a trial court's grant of a new trial under SDCL 15–6–59(a)(7), based on its interpretation of a statute. *Delzer v. Penn*, 534 N.W.2d 58, 61 (S.D.1995) (citations omit-

ted). We therefore review the trial court's decision to grant a new trial in this case *de novo* and without deference to its ruling that certain jury instructions were erroneously given.

## C.

### Sovereign Immunity

■■■ [¶ 19.] The State urges this Court to hold that its sovereign immunity, recognized in the Eleventh Amendment to the United States Constitution, shields it from SDDS's claim. In support of its argument, the State cites certain recent United States Supreme Court decisions (the Alden trilogy) that it believes act to bar SDDS's Fifth Amendment takings claim.[4]

■■■ [¶ 20.] In *Alden*, the Supreme Court held that "the States retain immunity from private suit in their own courts, an immunity beyond the congressional power to abrogate by Article I legislation." *Alden*, 527 U.S. at 754, 119 S.Ct. at 2266, 144 L.Ed.2d at 678. However, "[t]he constitutional privilege of a state to assert its sovereign immunity in its own courts does not confer upon a state a concomitant right to disregard the Constitution. The states and their officers are bound by obligations imposed by the Constitution . . . ." *Id.* at 755, 119 S.Ct. at 2266, 144 L.Ed.2d at 678. The Fifth Amendment in general and the takings clause in particular are integral parts of the Constitution, and they are made applicable to the states through the Fourteenth Amendment. *See Dolan v. City of Tigard*, 512 U.S. 374, 383–84, 114 S.Ct. 2309, 2316, 129 L.Ed.2d 304, 315 (1994) (citation omitted). It follows that South Dakota's sovereign immunity is not

4. *Alden v. Maine*, 527 U.S. 706, 119 S.Ct. 2240, 144 L.Ed.2d 636 (1999); *Florida Prepaid Postsecondary Educ. Expense Bd. v. College Sav. Bank*, 527 U.S. 627, 119 S.Ct. 2199, 144 L.Ed.2d 575 (1999); and, *College Sav. Bank v. Florida Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 119 S.Ct. 2219, 144 L.Ed.2d 605 (1999).

a bar to SDDS's Fifth Amendment takings claim.

[¶ 21.] An Oregon appeals court analyzed these issues of state sovereign immunity under the Eleventh Amendment in the context of another inverse condemnation action. *Boise Cascade Corp. v. Board of Forestry*, 164 Or.App. 114, 991 P.2d 563 (1999). In that case, Boise Cascade brought an inverse condemnation action because the State had forbidden logging on a tract of land under Oregon law protecting an endangered species. The Oregon court read *Alden* and *Reich v. Collins*, 513 U.S. 106, 115 S.Ct. 547, 130 L.Ed.2d 454 (1994), together to conclude "that states may be required to provide promised remedies in state court proceedings by force of the Due Process Clause alone." *Boise Cascade*, 991 P.2d at 567.

[¶ 22.] The Oregon court also relied on *First English Evangelical Lutheran Church of Glendale v. County of Los Angeles, California*, 482 U.S. 304, 107 S.Ct. 2378, 96 L.Ed.2d 250 (1987), which recognizes the Just Compensation Clause as a self-executing constitutional provision. Because it is self-executing, the remedy does not depend on statutory facilitation. Because it is a constitutional provision, it is a right of the strongest character. Reasoning from these precedents, the Oregon court concluded that a state could be sued in state court for takings in violation of the federal Constitution.

[¶ 23.] We agree with the statements of the Oregon court in *Boise Cascade* and with the trial court's analysis. In summary, the holdings in the *Alden* trilogy apply only to congressional attempts to abrogate a state's sovereign immunity through Article I legislation. The *Alden* trilogy does not suggest that Fifth Amendment takings claims that originate from the Constitution itself are barred by the Eleventh Amendment. On the contrary, the Eleventh Amendment will not immunize states from compensation specifically required by the Fifth Amendment.

### D.

### Permanent or Temporary Taking

 [¶ 24.] Takings jurisprudence, having developed over three-quarters of a century, is still in a state of flux.[5] *Tahoe–Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency*, —— U.S. ——, 122 S.Ct. 1465, 152 L.Ed.2d 517 (2002); *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1015, 112 S.Ct. 2886, 2893, 120 L.Ed.2d 798, 812–13 (1992). Serious discussion of the equities in takings cases must begin with Justice Holmes's maxim that, "while property may be regulated to a certain extent, if regulation goes too far, it will be recognized as a taking." *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 415, 43 S.Ct. 158, 160, 67 L.Ed. 322, 326 (1922). The problem, of course, is to know what is "too far" in any given case. Gen-

---

**5.** See Edward H. Ziegler, *Development Exactions and Permit Decisions: The Supreme Court's Nollan, Dolan, and Del Monte Dunes Decisions*, 34 Urb.Law 155 (2002); Anthony Saul Alperin, *The "Takings Clause": When Does Regulation Go "Too Far"?* 31 Sw. U.L.Rev. 169 (2002); Jon Lycett, *Landgate, Inc. v. California Coastal Commission: Why Temporary Takings Law is "Screwed Up,"* 7 Hastings W–NWJEnvtlL & P 55 (2000); William W. Wade, *Penn Central's Economic Failings Confounded Takings Jurisprudence*, 31 UrbLaw 277 (1999); Gregory M. Stein, *Pinpointing the Beginning and Ending of a Temporary Regulatory Taking*, 70 Wash.L.Rev. 953 (1995); J. Margaret Tretbar, *Calculating Compensation for Temporary Regulatory Takings*, 42 U.Kan.L.Rev. 201 (1993); Michael Allen Wolf, *Regulatory Takings: What Has the Supreme Court Wrought?* 327 PLI/Real 577 (1989); William J. Brady, *The Emergence of "Temporary Takings Damages" for Unconstitutional Restrictions on Land Use*, 1987 Det. C.L.Rev. 1095 (1987).

erally, the U.S. Supreme Court has avoided a formulaic answer to this question, opting instead for "essentially *ad hoc*, factual inquiries." *Penn Central Transportation Co. v. New York City*, 438 U.S. 104, 124, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631, 648 (1978).

[¶ 25.] The Supreme Court has, however, described at least two discrete categories of regulatory action as compensable without the case-specific inquiry into the public interest advanced in support of the restraint. "The first encompasses regulations that compel property owners to suffer a physical 'invasion' of their property. . . . The second . . . is where regulation denies *all* economically beneficial or productive use of land." *Lucas*, 505 U.S. at 1015–16, 112 S.Ct. at 2893, 120 L.Ed.2d at 812–13. In its most recent case, *Tahoe–Sierra*, the Court reaffirmed the case-specific analysis of *Penn Central* as the default procedure. "[T]he categorical rule in *Lucas* was carved out for the 'extraordinary case' in which a regulation *permanently* deprives property of *all* value; the default rule remains that, in the regulatory takings context, we require a more fact-specific inquiry." —— U.S. at ——, 122 S.Ct. at 1484, 152 L.Ed.2d at —— (emphasis added).

[¶ 26.] In the case before us, neither of the *Lucas* exceptions applies: there was never any question of the State's physically invading SDDS's property, nor was SDDS denied all economically beneficial or productive use of its land, since SDDS purchased the Lonetree site as rangeland, later sold it as such for $53,000, and could have so used it until a final decision on the proposal to use the site as a landfill had been made. Rather, we have to consider a circumstance in which the State unconstitutionally denied the exercise of a property right legally granted to SDDS, namely, the right to use the Lonetree site as a landfill.

As we held in *SDDS* V, the principle of *stare decisis* mandates that we not reopen the question whether the voters' action in precluding SDDS from developing the site did in fact constitute a taking: the Eighth Circuit already decided that question in the affirmative. With that matter settled, we have before us a more limited question: should this case be remanded for a new trial, in accordance with the trial court's order, because the jury instructions on damages were flawed?

[¶ 27.] Courts have arrived at no single measure for damages to be paid in compensation for a temporary taking. In *San Diego Gas & Electric Co. v. City of San Diego*, Justice Brennan explained that

the Constitution does not embody any specific procedure or form of remedy that the states must adopt: "The Fifth Amendment expresses a principle of fairness and not a technical rule of procedure enshrining old or new niceties regarding 'causes of action' when they are born, whether they proliferate, and when they die." *U.S. v. Dickinson*, 331 U.S. 745, 748, 67 S.Ct. 1382, 1384, 91 L.Ed. 1789, 1794 (1947). *Cf. U.S. v. Memphis Cotton Oil Co.*, 288 U.S. 62, 67–69, 53 S.Ct. 278, 280, 77 L.Ed. 619, 622–23 (1933). The States should be free to experiment in the implementation of this rule, provided that their chosen procedures and remedies comport with the fundamental constitutional command.

450 U.S. 621, 660, 101 S.Ct. 1287, 1306, 67 L.Ed.2d 551, 578 (1981) (Brennan, J., dissenting). "The just compensation for a permanent taking is generally the fair market value of the property taken, whereas the recovery for a temporary taking is generally the rental value of the property." *Bass Enterprises Production Company v. United States*, 133 F.3d 893, 895 (Fed.Cir.1998) (Bass II) (citing *Yuba,*

821 F.2d at 641 (Fed.Cir.1987)). "Just compensation for a temporary taking does not take into account the fair market value of the property either before or after it is taken." *Bass Enterprises Production Co. v. United States,* 48 Fed.Cl. 621, 623–24 (2001) (Bass IV) (citation omitted). Thus, as a preliminary matter, we have to determine whether the taking was permanent or temporary.[6]

[¶ 28.] In *Bass II,* the Federal Circuit considered an appeal of a Federal Claims Court decision, *Bass Enterprises Production Co. v. United States,* 35 FedCl 615 (1996) (Bass I), that Bass had suffered a permanent taking in a situation in which Bass had been prevented for forty-five months from exercising its rights to oil and gas production from a federal lease. Bass had held the lease since 1952, but had not attempted to make use of it until the early 1990s. *Id.* at 616. In the meantime, the United States had condemned the surface of the leased land to ensure the possibility of constructing the Waste Isolation Pilot Plant (WIPP), a facility to be located 2000 feet below the surface in an ancient salt formation. *Id.* Then, in 1992, Congress passed the WIPP Land Withdrawal Act to obtain land from the public domain for waste disposal and to establish a regulatory framework to govern the site. The Act generally prohibits drilling through and underneath the site from outside the withdrawn lands. It exempts rights existing at the time of withdrawal. Plaintiffs' existing rights were not to be affected unless the Environmental Protection Agency [EPA] determined that it had to acquire plaintiffs'

lease in order to comply with final disposal regulations or with the Solid Waste Disposal Act.

*Id.* As of the date of *Bass II's* issuance (January 7, 1998), the EPA had not made a final determination. Nonetheless, the *Bass II* court concluded that

any taking here is not a permanent taking. Congress has expressly established a mechanism for condemning the leases at issue if deemed necessary to ensure the integrity of the WIPP facility. Such events are statutorily mandated to occur. Thus, in the interim, the denial of the permits is at best a temporary taking. The statutorily mandated end to the regulatory process will result in a decision whether or not to condemn the leases. Although the precise date is unknown, it is clear that such a decision is required to be made. Thus, we conclude that the denial of the drilling permits at this time does not constitute a permanent taking.

*Bass II,* 133 F.3d at 895–96. The *Bass II* court then remanded the case to determine whether a temporary taking had occurred.

■■■ [¶ 29.] In our case, the regulatory and legal struggle over SDDS's right to use Lonetree as a landfill came to an end with the *Lonetree III* court's ruling that the popular "veto" of SB 169 by referendum was unconstitutional.[7] Suppose, however, that the *Lonetree III* court had ruled the veto constitutional. Clearly, if the *Lonetree III* court had so ruled, SDDS would have suffered a loss of some sort. In *First Evangelical,* the Supreme Court defined " 'temporary' regulatory takings [as] those regulatory takings which are

---

6. The Eighth Circuit made no decision on this question and issued no directive on the proper measure of damages.

7. "In November 1992, the referred measure was defeated, *effectively* vetoing the Lonetree facility." *Lonetree III,* 47 F.3d at 266 (em-

phasis added). "S.B. 169 was ... *effectively* vetoed by the citizens of South Dakota, and the Lonetree project has been unable to proceed since." *Lonetree I,* 994 F.2d at 489 (emphasis added).

ultimately invalidated by the courts." 482 U.S. 304, 310, 107 S.Ct. 2378, 2383, 96 L.Ed.2d 250, 260–61 (1987). Taken together, the Supreme Court's definition of "temporary" and the condition of our hypothetical suffice to confirm that SDDS would not have suffered a "temporary" taking: its right to make use of its permit would *not* have been *postponed* for a definite period of time, but *invalidated for the foreseeable future.* Indeed, "the distinction between 'permanent' and 'temporary' takings refers to the nature of the intrusion and not its temporal duration." *Skip Kirchdorfer, Inc. v. United States,* 6 F.3d 1573, 1582 (Fed.Cir.1993). Under the condition of our hypothetical, then, SDDS would have suffered something other than a "temporary" taking. And although we do not, of course, have to decide the measure of damages under the hypothetical condition, "[t]he just compensation for a permanent taking is generally the fair market value of the property taken...." *Bass II,* 133 F.3d at 895.

[¶ 30.] Interestingly, the Eighth Circuit used fair market value in calculating the damages in a situation where the plaintiff was prevented from exercising "a vested right to continued light industrial zoning" on land that a county government had rezoned to preclude that use of the property. *Nemmers v. City of Dubuque, Iowa,* 716 F.2d 1194, 1197 (1983) (Nemmers I). Although in a subsequent case, the Eighth Circuit denominated the loss Nemmers suffered a "temporary" taking "between the date of the taking (October 22, 1980) and the date of the district court's entry of judgment (April 30, 1980)," Nemmers remained unable to exercise his vested right because the County retained the new zoning that he had challenged. *Nemmers v. City of Dubuque, Iowa,* 764 F.2d 502 (1985) (Nemmers II). As in the situation that would ensue under our hypothetical condition, the plaintiff in the *Nemmers* cases could not exercise his right for the foreseeable future. It is, of course, not our intention to mince words by claiming that the taking Nemmers suffered was "permanent," but it is relevant to point out that, had the Eighth Circuit found the result of the referendum to have been constitutional, SDDS would have more closely resembled the plaintiff in the *Nemmers* cases than the plaintiff in the *Bass* cases, since, for the foreseeable future, SDDS could not have used the Lonetree site as it had planned.

[¶ 31.] Before we decide whether SDDS suffered a temporary or a permanent taking, we have to consider the effect of the *Lonetree IV* court's ruling that South Dakota may not relitigate the question "whether the referendum was the proximate cause of SDDS's dissolution." 97 F.3d at 1042. SDDS would have us read this holding of the Eighth Circuit and various dicta of that court to mean that "a facility ... [was] unconstitutionally destroyed and no longer existed." We reject that interpretation. The Eighth Circuit was concerned to dismiss the State's argument that, "because the [BME] permit had been revoked, the referendum had no impact, discriminatory or otherwise, on Lonetree." *Id.* at 1039. The court's rebuke was indeed sharp: "if this court were to ignore South Dakota's intermediary actions and look only to the result, it would reward South Dakota for acting unconstitutionally. Moreover, the administrative permit was voided [because of] a procedural defect, not because of any finding that the Lonetree facility was environmentally dangerous." *Id.* (quoting *Lonetree III,* 47 F.3d at 270 n. 10). The court's point was that it was the vote on the referred question, *not* the voiding of the permit (especially since that voiding was on procedural rather than substantive grounds) that was the proximate cause of SDDS's dissolution. However, in the present context, the

State's hypertechnical defense and the court's common-sense rebuke are both beside the point.

[¶ 32.] What matters is that the Eighth Circuit found only that the referendum *effectively* vetoed SDDS's proposed use of the Lonetree site as a landfill. *Supra*, n7. Indeed, SDDS "could reapply for the administrative permit," though, to be sure, "the referendum at the very least made the Lonetree project more difficult and expensive to accomplish." *Lonetree IV*, 97 F.3d at 1039 (quoting *Lonetree III*, 47 F.3d at 270 n. 10). Thus, the Eighth Circuit concluded, not once, but twice, that SDDS could reapply for a permit and proceed with its construction and operation of the Lonetree site. The deduction is inescapable that no action of the State destroyed SDDS as a legal entity. The fact that "the referendum was the proximate cause of SDDS's dissolution" is evidence only of the house-of-cards nature of SDDS's financing. By contrast, the fact that Bass did *not* go out of business as a result of an even longer temporary taking of its property rights is evidence of the reverse. Therefore, we hold that SDDS suffered a temporary, not a permanent, taking of its right to construct and operate a landfill on the Lonetree site.

### E.

### Damages for Temporary Taking

■■■■ [¶ 33.] We now turn to the question of proper calculation of damages

for the forty-three month period during which SDDS was denied the use of its permit. Obviously, the trial court found this case perplexing and to solve the question of proper damages told the lawyers on the first day of trial that "there just is no one measure of damages here. And my inclination frankly is to let you both submit your theory of damages to the jury and let them decide what's just compensation." At the end of the trial, the court allowed the jury to choose one of three different means of computing damages. In brief, these were (1) the fair market rental value of the property for the period of the taking, (2) the lost return on investment on the portion of fair market value lost over the period of the taking (the *Nemmers II* model), and (3) the market rate of return on the value of option and royalty income. After the conclusion of the trial, the court determined that the jury instructions improperly permitted the jury to award consequential damages and ordered a new trial.[8] Reviewing jury instructions for error of law, we adhere to the minority rule that, if any one of alternative theories of recovery is correct, it is presumed that the jury followed the correct one. *See generally Allen v. McLain*, 75 S.D. 520, 69 N.W.2d 390 (1955). However, under the unique circumstances of this case, we conclude that none of the three instructions was an accurate statement of the law.[9]

■■■■ [¶ 34.] Before proceeding to a discussion of the three measures of dam-

8. No court has ever held that SDDS was entitled to damages for a permanent taking. Yet the evidence SDDS presented and the instructions the court gave allowed the jury to award damages as if the taking here was a permanent one. Indeed, SDDS may have effectively converted its temporary taking claim to permanent taking claim by insisting that it forever lost its opportunity to operate a waste facility in South Dakota. Accordingly, its damage estimates ranged from $17 to $51 million.

9. A trial court commits reversible error by giving inconsistent and contradictory instructions on a material issue, such as damages. *See Janke v. Duluth & Northeastern Railroad Co.*, 489 N.W.2d 545, 549 (Minn.Ct.App. 1992). As this Court held over a century ago,

instructions which are inconsistent or contradictory when asked, should, of course, be refused, and the giving of such instructions is erroneous, and almost invariably held a ground for reversal. It is not for the jury to

ages in the jury instructions, we reemphasize the following points:

- "[T]he default rule remains that, in the regulatory takings context, we require a ... fact-specific inquiry." *Tahoe–Sierra*, —— U.S. at ——, 122 S.Ct. at 1484, 152 L.Ed.2d at ——.

- "[T]he landowner has no right under the Just Compensation Clause to insist that a 'temporary' taking be deemed a permanent taking." *First English*, 482 U.S. at 317, 107 S.Ct. at 2387, 96 L.Ed.2d at 265.

- Various methods for calculating compensation for temporary takings have been created: fair rental value, option value, interest on lost profit, before-and-after valuation (two methods), market rate of return, the equity interest approach, the Herrington standard, and the public benefits approach. Tretbar, *Calculating Compensation*, 42 UKanLRev at 217–18 (citations omitted). Some courts suggest that any of these measures may be appropriate, depending on the facts of the specific case. *Corrigan v. City of Scottsdale*, 149 Ariz. 538, 720 P.2d 513, 518–19 (1986) (en banc). Nonetheless, regardless of the method used, compensation must be limited to the property owner's *actual loss, id.* at 519, as calculated with "reasonable certainty." *City of Austin v. Teague*, 570 S.W.2d 389, 395 (Tex.1978).

- One problem that pervades these various damage measures is the "speculativeness" inherent in deciding what level of use owners might have made of their property but for the temporary taking. *Herrington v. County of Sonoma*, 790 F.Supp. 909, 915 (N.D.Cal.1991). The danger is the possibility of allowing a landowner to receive the full "investment portfolio" return on merely its delayed use of the property. *Id.* at 923.

- Because of (a) the unsettled nature of temporary takings law, (b) the wide divergence in the various damage measures, and (c) the inherent speculativeness of many of these, courts are free to craft new measures in accordance with the fact-specific inquiries that almost all temporary takings demand. Thus the *Herrington* court created an entirely new probability model, and the *Bass IV* court substantially modified the model it had initially proposed in *Bass Enterprises Production Co. v. United States*, 45 Fed. Cl. 120 (1999) (*Bass III*).

- All that having been said, the fact remains that, "the recovery for a temporary taking is generally the rental value of the property." *Bass II*, 133 F.3d at 895. Our task, then, is to fit this general rule to the specific facts of the case at hand.

## The *Nemmers* Model

[¶ 35.] As a preliminary point, we note that the Eighth Circuit created the *Nemmers* measure of damages with reference only to Iowa law, not to federal law. "We hold that the defendants' actions violated Nemmers' rights under the Iowa constitution and reverse." *Nemmers I*, 716 F.2d at 1195. "In our view, the Iowa Supreme Court would find that Nemmers had a vested right to L–1 zoning under state law." *Id.* at 1197. Accordingly, the *Nemmers* model has less persuasive force than

---

select from contradictory instructions those which correctly express the law. *State v. Evans*, 12 S.D. 473, 477, 81 N.W. 893, 894 (1900). Only when we can find that the jury was not misled will we hold that contradictory instructions will not result in reversal. *Blair v. City of Groton*, 13 S.D. 211, 216, 83 N.W. 48, 50 (1900).

it would have if it had been decided under federal law. Additionally, as we have shown in the discussion of our hypothetical condition, the *Nemmers* model is more properly suited to a situation in which a plaintiff is prevented *for the foreseeable future* from exercising a constitutionally recognized right. SDDS was not so prevented. In any event, SDDS had a *right* to no more than a five-year permit.

[¶ 36.] There is no dispute that fair market value is the proper measure of just compensation where land is taken permanently by the government. *Yuba,* 904 F.2d at 1580. However, temporary takings valuation is not a derivative of permanent takings value. *Bass IV,* 48 Fed.Cl. at 623. The Supreme Court has held that "fair compensation for a temporary possession of a business enterprise is the reasonable value of the property's *use.*" *United States v. Pewee Coal Co.,* 341 U.S. 114, 117, 71 S.Ct. 670, 672, 95 L.Ed. 809, 813 (1951) (citing *Kimball Laundry Co. v. United States,* 338 U.S. 1, 69 S.Ct. 1434, 93 L.Ed. 1765 (1949)) (emphasis added). But, "[i]nterest on the fair market value of the property does not provide a method that accurately reflects the reasonable value of the property's *use.*" *Bass IV,* 48 Fed.Cl. at 623 (emphasis added). The insistence on *use,* both by the Supreme Court and by the U.S. Court of Federal Claims in the recent *Bass IV* decision (2001) is crucial. In a market economy, risk is a key factor in any investment decision: investors have the option of safely putting their money away into a bank at a relatively modest rate of interest or of trying to beat the bank rate by putting their money into ventures more or less risky. The *use* of the Bass drilling rights and the *use* of

SDDS's dumping rights could be expected to produce income *different from* (perhaps greater than, perhaps less than) mere interest on the market value of the property in either case.

[¶ 37.] The *Nemmers* model suffers from two additional problems. The market rate of return on the difference in value of the Lonetree site with and without the permit bears no clearly discernible relationship to the rental value of the property. More significant for us is the practically inordinate degree of speculativeness in its application to our facts. As noted earlier, the estimates proposed by SDDS ranged from $17 million to $51 million. Furthermore, one of the methods on which those estimates were based predicted an astronomical amount of nearly $435 million if the taking had lasted three times as long as it in fact did.[10] Such uncertainty in the estimates of damages gives us concern. Taken together, the foregoing reasons persuade us that the *Nemmers* model cannot be used to calculate damages for the forty-three month temporary taking.

**Option and Royalty Method**

[¶ 38.] In its appeal, SDDS argues only for the *Nemmers* model, not for the option-and-royalty method. We note, however, that it suffers from the same speculative character as the *Nemmers* model.

### *Bass III* Model

[¶ 39.] The circumstances in the four *Bass* cases are similar to those underlying the five *SDDS* and the five *Lonetree* decisions. To summarize the fact situation in the *Bass* cases, Bass was prevented from developing oil and gas rights on lands that it had legally leased for that purpose. The *Bass III* court concluded that it could not "award plaintiffs a royalty interest or

---

**10.** All of SDDS's estimates used a capitalization-of-income method for calculating damages. But that approach, as the trial court rightly noted, would allow SDDS to recover more from the forty-three-month temporary taking than it would have had it suffered a permanent taking.

the present value of the income stream. Both calculations would lead to double recovery. Plaintiff's damages are measured by the interest they would have earned on the oil and gas profits during the period of the delay."[11] 45 Fed.Cl. at 124. The reason for that measure of damages was that the resources were still in place, ready to be developed. *Id.* at 123. Bass's loss consisted of not being able to exploit those non-renewable resources for the period of the taking. *Id.* at 124. In our case, SDDS was prevented from developing a parcel of land as a solid waste disposal site. SDDS had rights in the land to exploit a resource, namely, empty volume suitable for waste storage. That resource, empty volume suitable for waste storage, like the petroleum in *Bass*, was still in place, ready to be developed after the taking ended. Like Bass, SDDS suffered the loss of not being able to exploit a non-renewable resource for the period of the taking.

[¶ 40.] The *Bass* cases are peculiarly relevant here because, essentially, the work of SDDS and that of Bass Oil are inverses of each other. Bass had a resource to be extracted, petroleum; SDDS had a resource to be "extracted," empty volume. Both were finite and non-renewable.[12] Petroleum-in-ground (a natural resource) becomes petroleum extracted, a human-altered substance. Insofar as Bass Oil was an extraction company, the natural resource it was to exploit consisted only of petroleum in the ground. Petroleum extracted has a different, higher market value because labor and capital have been expended in its production. Petroleum extracted then enters the general stream of commerce to arrive at last at end-users. On the other hand, end-users are extractors of waste from formerly useful products: they have materials and turn them into waste. Waste uncollected has a lower market value than waste collected and processed (compacted, sorted, etc.), labor and capital having been expended in its processing. Collected and processed garbage enters the general waste stream of commerce until it reaches a landfill. At that point, landfill operators are willing to exploit their non-renewable natural resource, empty volume suitable for waste disposal, by allowing it to be filled with collected, processed garbage. The natural resource which the landfill operator has the right to exploit is not garbage, but room to put garbage.

[¶ 41.] Perhaps the analogy between a waste disposal site and an oil well may be clarified graphically:

---

11. This measure of damages was proposed by the State, but rejected by the trial court. In his order for a new trial, the court stated that he had erred in not giving that instruction.

12. Yet, it is a mistake to analogize, as SDDS does, the value of oil and gas remaining in the ground for Bass's later exploitation to SDDS's investment-backed expectation interests. Of course, Bass had investment-backed expectation interests just as SDDS did. The proper comparison, however, is between (a) the value of oil and gas remaining in the ground for Bass's later exploitation and (b) the value of the volume on the Lonetree site for SDDS's later exploitation. The fact that the temporary delay for Bass was benign is an extraneous fact: it is true, but irrelevant to the legal situation. If SDDS had not been operating on a shoestring, perhaps the delay here would also have been benign. There is also no difference in the development rights at issue in *Bass* and in *SDDS:* Bass did not have effective development rights so long as it was prevented by the EPA from going forward; likewise, SDDS did not have effective development rights until the Eighth Circuit handed down its decision in *Lonetree III*. Furthermore, there is no difference in the finitude of the natural resource in the two cases. In *Bass*, it was oil and gas; in *SDDS* it was empty volume. Both require infrastructure to be developed.

Oil-in-ground (non-renewable resource) => developed oil => consumers

Empty volume (non-renewable resource) <= developed waste <= producers

Seen in this way, SDDS is in the position of Bass. Bass insofar as it was a company that developed oil (i.e., pumped it out, rather than refining the crude, transporting it, etc.)—and thereby used up what it had purchased—had something to sell to those downstream (refiners, etc.); similarly, SDDS insofar as it was to be a company that developed volume (i.e., filled it in, rather than processing what was to go into it, transporting it, etc.)—and thereby would use up what it had purchased—would have had something to sell to those upstream (trash collectors, etc.). Both Bass and SDDS were forced to wait and should recoup damages that resulted from having to wait. The fact that Bass was a sufficiently strong company to survive the wait is as irrelevant as the fact that SDDS was insufficiently strong to survive similarly. Such are the market breaks. "Mere fluctuations in value during the process of governmental decisionmaking, absent extraordinary delay, are incidents of ownership. They cannot be considered as a taking in the constitutional sense." *Tahoe–Sierra,* —— U.S. at ——, 122 S.Ct. at 1484, 152 L.Ed.2d at 546 (citations omitted).

[¶ 42.] As noted above, the Supreme Court requires, in a case like ours, of a non-categorical taking, a fact-specific inquiry. *Id.* at ——, 122 S.Ct. at 1484, 152 L.Ed.2d at 547. One of the facts to be considered, however, is *not* the fact (alleged by SDDS) that the market for its services collapsed by the time it was allowed to resume work under its permit. That fact, if it is one, is precisely an "incident of ownership" that any participant in a market-based economy must factor into its calculations. That Bass was able to resume its drilling activities, but SDDS was not able to resume its volume-filling activities are examples of facts which neither the *Bass* court could nor this Court can consider.[13]

[¶ 43.] At this point, however, we come face to face with the same problem that was encountered after the court's decision in *Bass III:* neither Bass nor SDDS would have made a profit during the period of their respective takings. *See Bass IV,* 48 Fed.Cl. at 625. Thus, to award interest on lost profits would in either case be to award nothing at all. That result is manifestly unjust. Therefore, we, as did the court in *Bass IV,* reject the *Bass III* method of measuring SDDS's losses. *See Id.*

**Fair Rental Value Model**

[¶ 44.] Fair rental value is a more equitable measure of damages than interest on lost profits because, as noted

---

13. SDDS complains that, while it was losing its chance to exploit its non-renewable resource of empty volume, other landfills were taking up the slack. But that is no different from noting that, while Bass Oil was losing its chance to exploit its non-renewable resource (petroleum), other oil companies were jumping at the chance to do so. The latter was of no apparent concern to the *Bass III* court, aside from requiring the government to pay for interest on Bass's losses during the taking. True, the market SDDS faced may have been worse in 1995 than it was in 1991; similarly,

Bass might have faced a worse market after the taking in its case ended. But either might well have faced a better market. Surely, neither would expect to disgorge any windfall if one had come on line when there had been a shortage of empty volume suitable for waste storage and the other had come on line when there had been a shortage of petroleum. To understand that these situations require some other sort of redress is to contemplate a corporate bail-out, a remedy peculiarly suited to the expertise of the legislative branch, not the judiciary.

above, SDDS would not have had any profits during its startup period. To be sure, the trial court here did instruct on fair rental value as a measure of damages, but calculating fair rental value, without more guidance, is at least as problematic as determining damages under the *Nemmers* model. First, the fair market rental value of the property from July 1, 1991, until February 6, 1995, without the effect of the referendum, cannot be anything but speculative, for there were no comparable rentals in the area. As the *Nemmers II* court says of sales, "[w]hen there are no comparable sales, market value must be estimated," 764 F.2d at 505, so we say of rentals. Therefore, second, and more important, the estimates of fair rental value would involve the very same calculations that SDDS used to establish its damages as lying between $17 million and $51 million. That is, if SDDS had rented Lonetree to company X for use as a landfill, presumably X (according to SDDS's figures) would have made profits lying between $17 million and $51 million. Then, if SDDS were to have collected, say, 10% of those profits in rent, its damages would range between $1.6 million and $5.5 million. Third, however—and this consideration is for us dispositive—aside from the initial uncertainty of the numbers, fair rental value is unusable for an entirely different reason: there would have been no company X that would have rented Lonetree for use as a landfill for only forty-three months because there would have been little or no profit according to SDDS's projections for that initial period. Indeed, no company would have rented Lonetree for use as a landfill except for a period well in excess of forty-three months.[14] That is, the fair market rental value over that limited period is incalculable because Lonetree probably could not have been rented as a landfill for so short a time. Unlike *Kimball Laundry*, 338 U.S. 1, 69 S.Ct. 1434, 93 L.Ed. 1765, where a laundry facility was taken over by the federal government for a period of time, during which it could certainly have generated rental income while being *used* as a laundry in the private sector, Lonetree could not have been rented, except for range land, for a forty-three-month period. But that result, like the result under the *Bass III* model, would be unfair to SDDS. Accordingly, the trial court's first method of calculating damages must also be rejected.

### The *Bass IV* Model

[¶ 45.] The decision in *Bass IV* is persuasive for several reasons. There, as in our case, "[t]he parties agree[d] that initial investment costs would reduce any profits to a negative number." 48 Fed.Cl. at 625. Where *Bass IV* "involve[d] the taking of a right to develop and drill for natural resources," our case involves the taking of a right to fill empty volume. *Id.* at 624. In both situations, "[t]he resources will remain [on site] until plaintiffs are permitted to develop them." *Id.* "Bass has not lost any of the oil or gas"; similarly, SDDS did not lose any of the empty volume. *Id.* Both "Bass [and SDDS] lost time." *Id.* Like the *Bass IV* court, we recognize, as noted above, that, in general, the measure of compensation for a temporary taking is fair rental value. *Id.* at 624. However, as shown above, fair rental value is an unworkable measure for SDDS's damages. Recognizing the same difficulty, the *Bass IV* court determined that "[f]air rental value in this case [is] approxi-

---

14. This fact is confirmed in independent fashion by reflection on the fact that SDDS's calculations involving capitalization of income resorted to a multi-year income stream. This, despite the fact that, at most, SDDS had a five-year permit but no assurance of its renewal.

mate[d][by] the difference in interest on the cash flows.... Bass's loss is limited to the difference between the interest on the present value of the cash flows with and without the delay." *Id.* at 625.

[¶ 46.] To arrive at this result, the *Bass IV* court sought a damage model that would focus

on compensating plaintiffs for what they actually lost. Plaintiffs were delayed in their development efforts. A hypothetical lessee would have rented this property to develop, just as Bass did. But if the property had been developed, less oil and gas would have been available for plaintiffs if the property were returned. So the question is, what would Bass have charged to delay development for four years[?]

*Id.* at 622. We recognize that there is one significant difference between Bass and SDDS at the point of deciding on the appropriate measure of damages: Bass was a going concern at the time *Bass IV* issued, whereas SDDS now exists as a legal entity only. However, in view of the substantial similarities between Bass and SDDS, similarities that we have detailed at length, we hold that SDDS's damages are to be measured by the difference between the interest on the present value of SDDS's cash flows, as they would have been with and without the forty-three-

month delay.[15] Equity requires that we devise a measure of damages that is fair *both* to SDDS *and* to South Dakota. Under the vexing circumstances of the present case, we conclude that the *Bass IV* model best approximates what equity requires.

[¶ 47.] Affirmed and remanded for trial in accordance with these instructions.

[¶ 48.] GILBERTSON, Chief Justice, AMUNDSON, Justice, MILLER, Retired Chief Justice, and ANDERSON, Lee, Circuit Judge, concur.

[¶ 49.] ANDERSON, Lee, Circuit Judge, sitting for SABERS, Justice, disqualified.

[¶ 50.] ZINTER, Justice, not having been a member of the Court at the time this action was submitted to the Court, did not participate.

15. Like the *Bass IV* court, we do not here rule on the cash flow amounts or the interest factor to be applied. 48 Fed.Cl. at 625. The appropriate procedure for calculating damages in the new trial on remand would likely be as follows:
1. Determine the cash flow that SDDS was reasonably certain to have received without the delay;
2. Apply an appropriate discount percentage to reduce the cash flow to present value as of the beginning of the takings period;
3. Determine the cash flow that SDDS was reasonably certain to have received with the 43 month delay;
4. Again, determine the present value of this second cash flow as of the beginning of the takings period;
5. Determine the appropriate interest rate and apply it for the forty-three-month period to the present value of the two cash flows;
6. Subtract those two figures to determine SDDS's loss for the takings period as of February 1995; and
7. Add Interest to the award, computed from the end of the takings period at the appropriate legal rate.